## McKAY [1] v. KALYTON.

ERROR TO THE SUPREME COURT OF THE STATE OF OREGON.

No. 181. Argued January 25, 1907.—Decided February 25, 1907.

Although the Federal right was first claimed in the state court in the petition for rehearing, if the question was raised, was necessarily involved, and was considered and decided adversely by the state court, this court has jurisdiction under § 709, Rev. Stat.

The United States has retained such control over the allotments to Indians that, except as provided by acts of Congress, controversies involving the determination of title to, and right to possession of, Indian allotments while the same are held in trust by the United States are not primarily cognizable by any court, state or Federal.

The act of August 15, 1894, 28 Stat. 286, delegating to Federal courts the power to determine questions involving the rights of Indians to allotments did not confer upon state courts authority to pass upon any questions over which they did not have jurisdiction prior to the passage of such act, either as to title to the allotment, or the mere possession thereof which is of necessity dependent upon the title.

THIS suit was commenced in the Circuit Court of Umatilla County, Oregon, by the filing of a complaint in the name of Agnes Kaylton, suing by her mother, Louise Kaylton, as guardian *ad litem.* Mary Kaylton and six other persons were made defendants, one such (Charles Wilkins) being sued as the acting United States Indian agent at the Umatilla reservation.

It was alleged in substance as follows: By virtue of an act of Congress approved March 3, 1885, and the amendments

---

[1] Substituted for Kalyton.

thereto, a tract of land in the Umatilla Indian reservation was duly allotted on April 21, 1891, to one Joe Kaylton, a member of the Cayuse tribe residing on said reservation. It was alleged that in or about the year 1893 Joe Kaylton, the allottee, in accordance with the customs of the Cayuse tribe, married Louise ————, an Indian woman of that tribe, and the plaintiff, Agnes Kaylton, was issue of the marriage. In 1898 Joe Kaylton died intestate, leaving the plaintiff as his sole heir, and, under the laws of Oregon and the provisions of the act of Congress referred to, she became entitled to the land allotted to her father and to the possession and enjoyment thereof. It was charged that Mary Kaylton and four of the defendants, all insolvent, claiming to be heirs of the deceased, had taken and held possession of the land in question, which had a rental value of $274.75 per annum. It was alleged that one of the defendants named Glasscock claimed to have some interest in the land and was confederating with the other defendants, who were wrongfully alleging themselves to be the heirs of Joe Kaylton, with the object of depriving plaintiff of the use of the land and the enjoyment of the rents and profits thereof. Averring that under the rules and regulations of the Department of the Interior, in order that plaintiff might obtain the use and enjoyment of the land, it was requisite that her status as legal heir of the deceased should be adjudged by a court of competent jurisdiction, the court was asked to so decree and to perpetually restrain the defendants from interfering with her possession and use of the land. General relief was also prayed.

An answer was filed on behalf of the defendant Mary Kalyton. It was therein denied in substance that there had been a marriage between Joe and Louise Kalyton, and, that the plaintiff was their child, and, averring that Joe Kalyton was a resident and citizen of Oregon and had died intestate, unmarried and without any lineal descendant. It was alleged that the defendant, as the sister of Joe Kalyton, was his sole heir, and as such was the owner of and entitled to the posses-

sion of the lands in controversy and to its enjoyment. A decree was prayed quieting her alleged title.

The other of the defendants, who were alleged to be confederating with Mary Kalyton, filed a disclaimer of any interest in the lands in controversy. The cause was heard by the court. Deciding that if Joe Kalyton and Louise Kalyton had been married according to the custom of the Indians of the Cayuse tribe, such marriage would have been void, and that there had been no marriage between the parties, because none had been solemnized in accordance with the laws of the State of Oregon, the plaintiff was held to be an illegitimate child of the deceased, and to have no right, title or interest in or to the lands in question, and a decree was entered in favor of the defendant Mary Kalyton.

The cause was appealed to the Supreme Court of the State of Oregon. That court, having found that Joe and Louise Kalyton were married according to the custom and usage of the Indian tribe, to which they belonged, and that the plaintiff was the issue of such marriage, held, in view of the legislation of Congress, "that the plaintiff herein was born in lawful wedlock and is the sole heir of Joe Kalyton, deceased, and, as such, entitled to the possession of the real property of which he died seized." The decree of the trial court was, therefore, reversed, and a decree was entered in favor of the appellant in accordance with the opinion. A motion for a rehearing was made and overruled. This motion was based upon the contention that the court had erred in taking jurisdiction of the cause, for the reason that it involved the title and right to possession of public land held in trust by the United States for the benefit of Indians, and hence the United States was a necessary party defendant and not subject to the jurisdiction of a state court. We say the petition for a rehearing was based upon the grounds just stated, although the petition is not in the record, because it is manifest that such was the case from the opinion which the court delivered in refusing the rehearing. 45 Oregon, 116. In that opinion

the question whether the matter was one of exclusive Federal cognizance was elaborately considered, and it was decided that it was not, because a decree as to the right of possession would not interfere with the title or trust interest of the United States. And the court declared that for the purposes of determining its jurisdiction it was wholly irrelevant to consider whether it would have the power to enforce its decree for the possession of the allotted land against the officer of the United States in charge of the Indian reservation in case that official should decline to give effect to the decree for possession.

The case was then brought to this court.

*Mr. Samuel Herrick*, with whom *Mr. T. G. Hailey* and *Mr. R. J. Slater* were on the brief, for plaintiff in error:

The legal title to the lands involved in this suit is in the United States as trustees for twenty-five years for the allottee, or, in case of death, his heirs. Act of March 3, 1885, 23 Stat. 340. The only authority for such suit as this is the act of Congress of August 15, 1894, 28 Stat. 305, which confers jurisdiction therefor upon the United States Circuit Courts, and such jurisdiction is exclusive. Act Aug. 15, 1894, 28 Stat. 305; *Patawa* v. *United States*, 132 Fed. Rep. 894; *Parr* v. *United States*, 132 Fed. Rep. 1004; *Smith* v. *United States*, 142 Fed. Rep. 226; *Wisconsin Ry. Co.* v. *Price County*, 133 U. S. 496–504.

Prior to the passage of the act of August 15, 1894, *supra*, the authority to determine the rights of claimants to allotments upon the Umatilla Indian Reservation was vested in the Secretary of the Interior. Act March 3, 1885, 23 Stat. 340; *Mosgrove* v. *Harper*, 33 Oregon, 252.

Indians born within the territorial limits of the United States to whom allotments have been made, are citizens of the United States, and of the State or Territory where they may reside, and subject to and entitled to the benefits of all the laws, civil and criminal, of such State or Territory. Act Feb. 8,

1887, § 6, 24 Stat. 288; *Boyd* v. *Thayer*, 143 U. S. 135 162; *In re Heff*, 197 U. S. 488, 509; *State* v. *Denoyer*, 6 N. Dak. 286; *State* v. *Norris*, 37 Nebraska, 299; *In re Now-Ge-Zhuck*, 69 Kansas, 410.

Such Indian allottees are subject to the laws of the State in which they may reside governing their marriage relations. *Moore* v. *Wa-Me-Go*, 83 Pac. Rep. 400.

*Mr. William Frye White*, with whom *Mr. John B. Cotton* was on the brief, for defendant in error:

This court has no jurisdiction to review this cause on writ of error because no title, right or immunity specially set up or claimed under any Federal statute, has been denied. *Corkran Oil &c. Co.* v. *Arnaudet*, 199 U. S. 182.

If the court below erred as specified in the first assignment of error, in holding that the marriage of Joe Kalyton and Louise was a legal marriage under the act of February 28, 1891, it was an immaterial error and one which cannot in the nature of things be prejudicial to the party against whom the decision was rendered, and that, therefore, if the relief granted is correct according to law, this court will not reverse the decision below. *Erwin* v. *Lowry*, 7 How. 172.

The provisions of the act of February 8, 1887, and § 5 of the amendatory act of February 28, 1891, apply to lands allotted under the act of March 3, 1885, and that, therefore, the court below having found that Joe Kalyton and Louise, Indians residing upon the Umatilla Reservation, were married according to the customs and habits of such Indians, and having found that the plaintiff was the offspring of such marriage, it committed no error in holding and decreeing that the plaintiff should have the possession of the land of which her father as an allottee, died seized.

The Supreme Court of Oregon had jurisdiction of the subject-matter and the act of August 15, 1894, did not oust the jurisdiction of the state court and place it exclusively in the Circuit Court of the United States for the District of Oregon, but the

jurisdiction as between these courts is concurrent. *Jackson* v. *Jackson,* 17 Oregon, 110;·*Hindman* v. *Rizor,* 21 Oregon, 112; *Allen* v. *Dunlap,* 24 Oregon, 229; *Bishop* v. *Baisley,* 28 Oregon, 119; *Pacific Live Stock Co.* v. *Gentry,* 38 Oregon, 275; *Browning* v. *Lewis,* 39 Oregon, 11; *Moore* v. *Halliday,* 43 Oregon, 243; *Selkirk* v. *Stephens,* 72 Minnesota, 335; *Swartzel* v. *Rogers,* 3 Kansas, 374; *Wiley* v. *Keokeuk,* 6 Kansas, 94; *Ingrahm* v. *Ward,* 56 Kansas, 550; *Whirlwind* v. *Von der Ahe,* 67 Mo. App. 628;·*Felix* v. *Patrick* (C. C.), 36 Fed. Rep. 457; *Y-ta-tah-wa* v. *Rebock* (C. C.), 105 Fed. Rep. 257; *Felix* v. *Patrick,* 145 U. S. 317; *Bem-way-bin-ness* v. *Eshelby,* 91 N. W. Rep. 291; 16 Am. & Eng. Ency. Law, 216; *Stacey* v. *LaBelle,* 99 Wisconsin, 520; *Mo. Pac. Ry. Co.* v. *Cullers,* 31 Texas, 382; 22 Cyc., 149; *Wright* v. *Marsh,* 2 Greene (Iowa), 94; *Telford* v. *Barney,* 1 Greene (Iowa), 575; *Bem-way-bin-ness* v. *Eshelby,* 87 Minnesota, 108; *Bird* v. *Winyer,* 24 Washington, 269.

The Supreme Court of the State of Oregon having jurisdiction of the subject matter, the United States is not a necessary party defendant. *Hy-Tu-Tse-Mil-Kin* v. *Smith,* 194 U. S. 401.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

It is contended that we are without jurisdiction because no title, right or immunity was specially set up or claimed under any Federal statute and denied. But, leaving aside for a moment all other considerations, it is plain that the defendant below set up a claim of immunity from suit in the state court under the laws of the United States, and that the right to the immunity so asserted under an act or acts of Congress was expressly considered and denied by the state court. True it is that the immunity which was asserted was first claimed in a petition for rehearing, but as the question was raised, was necessarily involved and was considered and decided adversely by the state court, there is jurisdiction. *Leigh* v. *Green,* 193 U. S. 790.

At the threshold lies the question raised and decided below relative to the jurisdiction of the state court over the controversy.

Allotments of land in severalty to Indians residing upon the Umatilla reservation, in Oregon, were authorized by the act of Congress of March 3, 1885, ch. 319, 23 Stat. 340, which contained the following provision:

"The President shall cause patents to issue to all persons to whom allotments of lands shall be made under the provisions of this act, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs, according to the laws of the State of Oregon, and that at the expiration of said period the United States will convey the same by patent to said Indian or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That the law of alienation and descent in force in the State of Oregon shall apply thereto after patents have been executed, except as herein otherwise provided."

The allotment to Joe Kalyton was made on April 21, 1891. Before that allotment, Congress on February 8, 1887, ch. 119, 24 Stat. 388, passed what is known as the General Allotment Act. By that act, as said in *United States* v. *Rickert*, 188 U. S. 432, 435, provision was made for the allotment of lands in severalty to Indians on the various reservations, and for extending the protection of the laws of the United States and the Territories over the Indians. To that end the President was authorized, whenever, in his opinion, a reservation or any part thereof was advantageous for agricultural and grazing purposes, to cause it, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in the reservation in severalty to any Indian located thereon, in certain quantities specified in the statute, the allotments to be made by special agents appointed for that purpose, and by the

agents in charge of the special reservations on which the allotments were made. In one of the provisos of the first section of the act it was declared—

"That where the treaty or act of Congress setting apart such reservation provides for the allotment of lands in severalty in quantities in excess of those herein provided, the President, in making allotments upon such reservation, shall allot the lands to each individual Indian belonging thereon in quantity as specified in such treaty or act."

A provision of like nature to that heretofore excerpted from the act of March 3, 1885, was embodied in section 5 of the general allotment act of 1887, reading as follows (24 Stat. 389):

"SEC. 5. That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or encumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: *Provided,* That the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided."

The supervisory power possessed by the United States over allotted lands while the title remains in the United States was pointed out in the opinion in *United States* v. *Rickert,* *supra,* a case which came to this court upon questions certified from a Circuit Court of Appeals. The suit was instituted under the direction of the Attorney General of the United States for the purpose of restraining the collection of taxes alleged to be due the county of Roberts, South Dakota, in respect of certain permanent improvements on, and personal property used in the cultivation of, lands in that county occupied by members of the Sisseton band of Sioux Indians in the State of South Dakota. The lands referred to had been allotted under the provisions of an agreement made in 1889, ratified by an act of Congress in 1891, and more particularly under section 5 of the act of February 8, 1887, heretofore referred to. Discussing the interest which the Indians primarily acquired in the allotted land, it was concluded that "the United States retained the legal title, giving the Indian allottee a paper or writing improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee. . . . These lands were held by the United States in execution of its plans relating to the Indians— without any right in the Indians to make contracts in reference to them, or to do more than to occupy and cultivate them— until a regular patent conveying the fee was issued to the several allottees." And the court approvingly quoted the following passage from an opinion of the Attorney General, delivered in 1888, advising that allotments of lands provided for in an act of Congress were exempt from state or territorial taxation, "that the lands covered by the act are held by the United States for the period of twenty-five years in trust for the Indians, such trust being an agency for the exercise of a Federal power, and therefore outside the province of State or Territorial authority."

It was decided, in view of the object to be accomplished

by allotting Indian lands in severalty, that it was not within the power of a State to tax either the permanent improvements made on allotted lands or the personal property consisting of cattle, horses and other property of like character which might be furnished to Indians for use upon such land. And, answering a question as to whether the United States had such an interest in the controversy or in its subjects as entitled it to maintain the suit, the court declared (p. 444) that no argument to establish that proposition was necessary. Nor are the principles which were thus announced as to the nature and character of an allotment of Indian lands and the interest of the United States therein as trustee before the expiration of the period for their final disposition in any way affected by the decision In the *Matter of Heff*, 197 U. S. 488, dealing with the subjection of allottee Indians in their personal conduct to the police regulations of the State of which they had become citizens.

The present suit was commenced in 1899. At that time there was in force an act approved August 15, 1894, ch. 290, 28 Stat. 286, in which it was provided, *inter alia*, as follows (p. 305):

"That all persons who are in whole or in part of Indian blood or descent, who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any act of Congress, may commence and prosecute or defend any action, suit or proceeding in relation to their right thereto in the proper circuit court of the United States."

And it was provided that "the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him."

Considering the act of 1894 in *Hy-yu-tse-mil-kin* v. *Smith,* 194 U. S. 413, the court said:

"Under this statute there is no provision rendering it necessary in a private litigation between two claimants for an allotment to make the United States a party. The statute itself provides that the judgment or decree of the court, upon being properly certified to the Secretary of the Interior, is to have the same effect as if the allotment had been allowed and approved by the Secretary. This provision assumes that an action may be maintained without the Government being made a party, and provides for the filing of a certificate of the judgment and its effect; and the Government thereby, in substance and effect, consents to be bound by the judgment, and to issue a patent in accordance therewith."

The *Rickert case* settled that, as the necessary result of the legislation of Congress, the United States retained such control over allotments as was essential to cause the allotted land to enure during the period in which the land was to be held in trust "for the sole use and benefit of the allottees." As observed in the *Smith case,* 194 U. S. 408, prior to the passage of the act of 1894, "the sole authority for settling disputes concerning allotments resided in the Secretary of the Interior." This being settled, it follows that prior to the act of Congress of 1894 controversies necessarily involving a determination of the title and incidentally of the right to the possession of Indian allotments while the same were held in trust by the United States were not primarily cognizable by any court, either state or Federal. It results, therefore, that the act of Congress of 1894, which delegated to the courts of the United States the power to determine such questions, cannot be construed as having conferred upon the state courts the authority to pass upon Federal questions over which, prior to the act of 1894, no court had any authority. The purpose of the act of 1894 to continue the exclusive Federal control over the subject is manifested by the provision of that act, which commands that a judgment or decree rendered

in any such controversy shall be certified by the court to the Secretary of the Interior. By this provision, as pointed out in the *Smith case, supra,* the United States consented to submit its interest in the trust estate and the future control of its conduct concerning the same to the result of the decree of the courts of the United States, a power which such courts could alone exercise by virtue of the consent given by the act. The subsequent legislation of Congress, instead of exhibiting a departure from this policy, confirms it. By the amendments to the act of 1894, approved February 6, 1901, ch. 217, 31 Stat. 750, it is expressly required that in suits authorized to be brought in the Circuit Courts of the United States respecting allotments of Indian lands, "the parties thereto shall be the claimant as plaintiff and the United States as party defendant." Nothing could more clearly demonstrate, than does this requirement, the conception of Congress that the United States continued as trustee to have an active interest in the proper disposition of allotted Indian lands and the necessity of its being made a party to controversies concerning the same, for the purpose of securing a harmonious and uniform operation of the legislation of Congress on the subject.

The suggestion made in argument that the controversy here presented involved the mere possession and not the title to the allotted land is without merit, since the right of possession asserted of necessity is dependent upon the existence of an equitable title in the claimant under the legislation of Congress to the ownership of the allotted lands. Indeed, that such was the case plainly appears from the excerpt which we have made from the concluding portion of the opinion of the Supreme Court of Oregon.

Because from the considerations previously stated we are constrained to the conclusion that the court below was without jurisdiction to entertain the controversy, we must not be considered as intimating an opinion that we deem that the principles applied by the court in disposing of the merits of the case were erroneous.

*The judgment of the Supreme Court of Oregon is reversed and the cause remanded to that court for further proceedings not inconsistent with this opinion.*

The CHIEF JUSTICE, MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissent.