In re HUMBOLDT FIR, INC. and Blake & Tregoning Logging Co., Bankrupts.

UNITED STATES of America, Plaintiff,

v.

HUMBOLDT FIR, INC., Defendant.

No. C–76–1457–CBR.

United States District Court, N. D. California.

Jan. 13, 1977.

James L. Browning, Jr., U. S. Atty., Michael C. D'Amelio, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Rothschild, Phelan & Montali, Robert E. Phelan, San Francisco, Cal., for Humboldt Fir, Inc.

## ORDER

RENFREW, District Judge.

This case involves cross-appeals from a decision of the Bankruptcy Judge disallowing the claim of the United States, Creditor, and denying the affirmative claim of Humboldt Fir, Inc., debtor, against the United States.

On December 6, 1971, Humboldt Fir, Inc. ("Humboldt"), filed a Chapter XI petition with the Bankruptcy Court. In early 1969 the United States, through the Bureau of Indian Affairs ("BIA") on behalf of the Hoopa Valley Indian Tribe ("Tribe"), entered into a timber sale contract with Humboldt, which was to have been fully performed on or before December 31, 1969. Not all of the timber subject to the contract was taken during 1969. A written extension of the contract to December 31, 1970, was executed by Humboldt and the Tribe with the approval of the BIA. An additional one-year extension was requested by Humboldt in December, 1970. The Tribe agreed to the extension and the signed agreement was forwarded by the BIA to Humboldt on or about January 28, 1971. The extension was never executed by Humboldt's surety, Argonaut Bonding Company. In December, 1971, Humboldt requested an additional extension of the contract to December 31, 1972. No logging took place under the contract after September 15, 1969.

On January 2, 1972, the Hoopa Valley Tribal Council passed a resolution denying the request for a further extension. In April, 1972, the Tribe, by and through the BIA, issued public notice that the Tribe would offer the timber at public sale in Hoopa, California, in April, 1972. On April 18, 1972, prior to the proposed public sale, a representative of the Tribal Council advised Humboldt that a resolution had been passed prohibiting Humboldt from bidding on any tribal timber sale so long as tribal claims for damages remained unsettled. The highest bidder at the public sale was Sierra Pacific Industries. Humboldt did not sub-

mit a bid. The difference between the price included in the timber sale contract between Humboldt and the Tribe and the price included in the timber sale contract between Sierra Pacific Industries and the Tribe, based on the actual amount cut by Sierra Pacific Industries, was $144,659.23. The United States, through the BIA, filed its claim on behalf of the Tribe in that amount, which was disallowed by the Bankruptcy Judge.

In urging affirmance of the decision below disallowing the claim of the United States, Humboldt maintains that California law, which includes the Uniform Commercial Code, should apply. It contends that Congress, by enacting 28 U.S.C. § 1360, clearly established the jurisdiction of state laws over disputes to which Indians are a party, particularly disputes involving commercial transactions because there is no federal commercial law. The Bankruptcy Judge, in Conclusion of Law 8, implicitly found that California law controls the decision in this case by relying on the California Commercial Code. This Court does not agree.

■ The special relationship which exists between the Federal Government and the Indians has been extensively document-ed. *See, e. g.,* Felix S. Cohen, *Handbook of Federal Indian Law* (1942). Judicial decisions have consistently held that the responsibilities of the Government to the Indians must be discharged at the highest level of fiduciary standards. *See, e. g., Seminole Nation v. United States,* 316 U.S. 286, 296–297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *United States v. Kagama,* 118 U.S. 375, 382–384, 6 S.Ct. 1109, 30 L.Ed.2d 228 (1886). The Federal Government has endeavored to shield the Indian tribes from possible exploitation and abuse while gradually terminating the wardship of the Federal Government over their affairs. As part of this policy, Congress enacted 28 U.S.C. § 1360 which provides for state civil jurisdiction in certain actions to which Indians are parties.[1] This statute reflects an expression of the congressional intent that Indians are to become full and equal citizens of their respective states. *See Rincon Band of Mission Indians v. County of San Diego,* 324 F.Supp. 371, 374–375 (S.D.Cal. 1971), *rev'd on other grounds,* 495 F.2d 1 (9 Cir. 1974), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).[2]

■ However, by enacting § 1360, Congress did not intend an immediate termination of the relationship between the Indian

---

**1.** Section 1360 provides in relevant part:

"(a) Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| California | All Indian country within the State |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section."

**2.** The Court acknowledges, as did the Supreme Court in *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), that today congressional policy toward reservation Indians may less clearly favor assimilation than in 1953 when § 1360 was enacted.

tribes and the BIA or intend to abolish Indian immunity from state jurisdiction in certain significant areas including tribal self-government on reservation trust lands and economic development of reservation resources. Section 1360(b) exempts from state regulation the use of "any real or personal property * * * belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States * * *" if state regulation would be "inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto * * *." Section 1360(c) is designed to encourage tribal autonomy and self-government, which is a prerequisite to the economic self-development necessary to enable Indian participation in American life. See Santa Rosa Band of Indians, et al. v. Kings County, et al., 532 F.2d 655 (9 Cir. 1975).

Humboldt cites a recent decision of the Supreme Court, Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), as authority for the applicability of state law to contracts for the sale of tribal timber. In Bryan a unanimous court held that 28 U.S.C. § 1360 is not a grant of power to the states to tax reservation Indians nor does it confer state regulatory jurisdiction over the tribes themselves. The Court stated that the statute reaffirms "the existing reservation Indian-Federal Government relationship in all respects save the conferral of state court jurisdiction to adjudicate private civil causes of action involving Indians." 426 U.S. at 391, 96 S.Ct. at 2112, 48 L.Ed.2d at 723. However, this Court does not find that a dispute directly involving the use of Indian property held in trust by the United States and subject to detailed, extensive federal statutes and reg-

ulations is the type of private litigation contemplated by the Supreme Court in Bryan.

■■■ Indian trust lands are a Federal instrumentality held to effect the Federal policy of Indian advancement and therefore may not be burdened or interfered with by the State. See Santa Rosa Band of Indians, et al. v. Kings County, et al., supra, at 665–666. Where a dispute involves trust or restricted property, the state may not adjudicate the dispute nor may its laws apply. See Capitan Grande Band of Mis. Indians v. Helix Irr. Dist., 514 F.2d 465, 468–469 (9 Cir.) cert. denied, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975). The purpose of 25 U.S.C. § 407, which permits the sale of timber on unallotted lands of any Indian reservation, and the regulations made pursuant thereto is to protect the rights and beneficial ownership of the Indians. See United States v. Algoma Lumber Co., 305 U.S. 415, 421, 59 S.Ct. 267, 83 L.Ed. 260 (1939). In view of the fact that the contract was entered into by the Tribe for the benefit of the Tribe as a whole; and because the Supreme Court in Bryan reiterated that any ambiguity in § 1360 should be construed in favor of the Indians; and finally, because this statute should be construed within the entire framework of legislation affecting Indians, this Court finds that the Federal law of contracts applies to the contract between the Tribe and Humboldt. Cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 366–367, 63 S.Ct. 573, 87 L.Ed. 838 (1943).[3]

■■■ Where Congress has not adopted a different standard, construction of Federal contracts is governed by principles of general contract law. Priebe & Sons v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947). The Uniform Com-

---

**3.** This result is also suggested by the contract which incorporates the standard timber contract provisions of the United States Department of Interior, Bureau of Indian Affairs. Paragraph 4 provides:

"Timber Sold. The Seller agrees to sell to the Purchaser and the Purchaser agrees to buy, in accordance with the terms and conditions of

this contract and the attached Standard Timber Contract Provisions, hereinafter called the Standard Provisions, which are made a part hereof, all the merchantable timber, living or dead, designated for cutting by the Bureau of Indian Affairs on tribal lands within the boundaries of this logging unit."

mercial Code, adopted in fifty jurisdictions including California, is a recognized source of general contract law. *See United States v. Wegematic Corporation,* 360 F.2d 674, 676 (2 Cir. 1966). In the absence of federal cases on point, state statutory and decisional law may furnish a convenient source for the general law of contracts to the extent that it does not conflict with the Federal interest in developing and protecting the use of Indian resources. *Cf. Boccardo v. United States,* 341 F.Supp. 858, 862 (N.D. Cal. 1972). However, here, the result is also governed by applicable Federal law and regulations.[4]

■ We start with the proposition that time is of the essence in any contract, such as here, containing fixed dates for performance. *DeVito v. United States,* 413 F.2d 1147, 1154, 188 Ct.Cl. 979 (1969). This rule of construction is particularly applicable here, because the removal of blown down and bug-infested timber was required in order to preserve and protect healthy timber on the reservation trust lands. Thus, the contract limited the time for performance to the end of 1969. The agreement extending the time of performance to December 31, 1970, constituted an extension of Humboldt's obligation with respect to the time for performance.

■ The parties are in disagreement as to whether the subsequent attempts to extend the time for performance operated as further modification of the contract. The United States contends that, as of December, 1970, Humboldt was in breach for failure to perform. The events transpiring subsequent to Humboldt's second request for an extension do not clearly establish that Humboldt was in breach at that time. A review of the record supports the finding of the Bankruptcy Judge that the representative of the BIA represented to Humboldt that he would arrange for execution of the extension by Humboldt's surety. The record also supports the finding that had the surety received the extension, it would have been executed.

Section 2–208.2 of the Uniform Commercial Code[5] provides that "[t]he express terms of the agreement and any such course of performance * * * shall be construed whenever reasonable as consistent with each other * * *." Section 2–208.3 provides in relevant part that "such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." In this case the evidence shows that the Tribe intended to grant and the BIA to approve the second extension agreement. The letters of the Area Director of October 5, 1971, and November 12, 1971, requesting execution of the extension and modification contract indicate that performance had indeed been waived and the BIA was merely attempting to complete the formalities. In light of the parties' conduct, it is clear that the attempted modification operated as a waiver. U.C.C. § 2–208.3, § 2–209.4. *See Double-E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 296 (3 Cir. 1973).

■ Humboldt contends that the Tribe wrongfully refused to grant the third ex-

---

4. 25 U.S.C. § 406 provides:

"The timber on any Indian allotment held under a trust or other patent containing restrictions on alienations may be sold by the allottee, with the consent of the Secretary of the Interior, and the proceeds thereof shall be paid to the allottee or disposed of for his benefit under regulations to be prescribed by the Secretary of the Interior."

25 U.S.C. § 407 provides:

"The mature living and dead and down timber on unallotted lands of any Indian reservation may be sold under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct: *Provided,* That this section shall not apply to the States of Minnesota and Wisconsin."

5. The Court notes that the California Commercial Code has substantially identical provisions to those of the Uniform Commercial Code. The result reached here differs from that reached below, not because of the use of the Uniform Commercial Code but because of the finding here that the Tribe reasonably relied upon Humboldt's repudiation of the contract in question and Humboldt failed to appeal the respective decisions of the Area Director as provided in the applicable regulations.

tension which it requested in December, 1971.[6] Humboldt fails, however, to give adequate weight to its failure to undertake performance during 1971. The waiver of performance to December 31, 1970, did not operate as a waiver of performance for 1971. Section 2–209.5 of the Uniform Commercial Code provides that a party who has waived an executory portion of a contract may retract the waiver by reasonable notice that strict performance will be required. Section 2–609 provides that a party who has reasonable grounds for insecurity with respect to performance may demand adequate assurance of due performance. The letters from the Area Director of June 10, 1971, August 27, 1971, and October 5, 1971, constituted sufficient notice that strict performance would be required. Upon receipt of that notice, Humboldt was obligated to provide adequate assurance of performance. Humboldt failed to take any action.

Failure to perform or give adequate assurance of performance within a reasonable time not exceeding thirty days under the circumstances here amounts to a repudiation of the contract. U.C.C. § 2–609.4. Under § 2–610, upon repudiation, the aggrieved party may await performance for a commercially reasonable time. This the Tribe did. Humboldt's request for an additional extension to December 31, 1972, was not a retraction of the repudiation. It was not accompanied by any assurance that performance would be forthcoming. Furthermore, the filing of the Chapter XI petition with the Bankruptcy Court also raises the question of its ability to perform. Humboldt's action provided reasonable grounds for the Tribe to give notice by its resolution of January 2, 1972, that it was treating Humboldt's conduct as a clear repudiation of the contract and to resort to available remedies for breach.[7] U.C.C. 2–610.

■ Humboldt alleges that if a breach of contract as of January 1, 1972, is found, this Court should nevertheless find that the Tribe failed to give reasonable notice of its intent to resell the timber. Humboldt admits that it knew the BIA was again offering the timber for sale. However, it asserts that the resolution prohibiting it from bidding was the equivalent of a failure to give notice of the April 26, 1972, sale and evidence of the Tribe's bad faith. This claim is singularly lacking in merit. Upon receipt of the letter notifying Humboldt of the tribal resolution, Humboldt had the right to appeal that decision to the Area Director. Moreover, if, disregarding the tribal resolution, Humboldt had submitted the highest bid and was rejected, that decision might also have been appealed. 25 C.F.R. 141.11, 141.23. Humboldt chose to do nothing. Having failed to pursue available administrative remedies, Humboldt is barred from asserting that it did not receive notice of the sale or from asserting that the sale was not in good faith. Therefore, Humboldt's claim for affirmative relief will be denied.

■ Having found that the Tribe and its trustee, the United States, were not at fault for Humboldt's failure to perform, that there was no wrongful failure to extend the contract, and that Humboldt received reasonable notice of the time and place of resale, this Court concludes that the Tribe should be allowed to file its proof of claim in the amount of $144,341.98 to recover damages for a breach of contract by Humboldt.

Accordingly, IT IS HEREBY ORDERED that the United States, through the Bureau of Indian Affairs, be allowed to file a proof of claim on behalf of the Hoopa Valley Indian Tribe in the amount of one hundred forty-four thousand three hundred forty-one and ninety-eight hundredths dollars

---

6. Humboldt did not avail itself of the opportunity to appeal the decision of the Area Director denying the extension, as provided in 25 C.F.R. 2.2, 2.3, and 141.23. This is not surprising in light of its failure to take any action throughout the entire term of the contract after September 15, 1969, except to seek extensions of the time within which it had to perform.

7. Articles 2(i) and 2(j) of the standard timber contract provide that disputes and complaints of any action or decision on the contract may be submitted to the Area Director for resolution and those decisions may be appealed. Humboldt never resorted to this remedy.

($144,341.98) with the Bankruptcy Court and that the order below disallowing Humboldt Fir, Inc.'s claim for affirmative relief is affirmed.