John HEFFLE, Arctic John Etalook, Delbert J. Thronsen, Jack K. Morry, Louisa Morry, all unknown persons similarly situated, Appellants,

v.

STATE of Alaska, Appellee.

No. 5079.

Supreme Court of Alaska.

Sept. 15, 1981.

---

Clem H. Stephenson, Fairbanks, for appellants.

Larry D. Wood, Asst. Atty. Gen., Fairbanks and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE, and MATTHEWS, JJ., and CHRISTOPHER COOKE, Superior Court Judge.*

CONNOR, Justice.

This is an appeal from a superior court judgment enjoining Arctic John Etalook and the other defendants from interfering with the passage of traffic over the North Slope Haul Road.

Prior to December 18, 1971, Etalook filed an application for a Native allotment under the Alaska Native Allotment Act of 1906, ch. 2469, 34 stat. 197 (formerly 43 U.S.C. §§ 270–1 to 270–3, as amended) with the Department of the Interior for a 160–acre parcel of land located by Nugget Creek near its juncture with the Middle Fork of the Koyukuk River. Section 18 of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1617 (Supp. I 1977), repealed the Allotment Act, but permitted any allotment application pending on December 18, 1971, to be approved if the applicant desired the application process to continue. Etalook filed an additional application with the Fairbanks office of the Bureau of Land Management to express his interest in continued processing of his application. While Etalook waited for his allotment approval, the Trans-Alaska Pipeline Authorization Act of 1973, Pub.L.No. 93–153, 87 stat. 584 (codified at 43 U.S.C. §§ 1651–1655 (1976)) was enacted. Section 203(b) of the Pipeline Act, 43 U.S.C. § 1652(b), directed the Secretary of the Interior to issue rights-of-way across United States land for the pipeline and the Haul Road.

On May 2, 1974, the United States granted the right-of-way to the State of Alaska, subject to valid existing rights. Alyeska Pipeline Service Company, as agent for the state under AS 38.35.130, obtained a right-of-way agreement from Etalook for the Haul Road on May 27, 1975. Alyeska paid Etalook $25,000 for the right-of-way. During the negotiation of the agreement Eta-look was represented by an attorney, an official of the federal Bureau of Indian Affairs (B.I.A.), defendant Heffle, and several other friends and relatives. On August 22, 1975, the Bureau of Land management issued Etalook a certificate of Native allotment.

At the time that the agreement was signed, the B.I.A. took the position that it lacked jurisdiction to approve the agreements until the Bureau of Land Management (B.L.M.) executed a certificate of allotment to Mr. Etalook, because until then he would not be the certified owner of the allotment. However, a letter of non-objection to the right-of-way agreement was executed by the superintendent of the Fairbanks office of the B.I.A. On August 22, 1975, the B.L.M. issued the certificate. Three years later, in November, 1978, the State of Alaska and Alyeska made a joint application to the Secretary of the Interior to approve and confirm the highway right-of-way across Arctic John's allotment. This application is currently pending before the B.I.A., which has indicated that the agreement cannot be approved without further investigation into the circumstances of Etalook's consent. Meanwhile, the road was built and is now part of the state highway system.

After disagreements over the use of the Haul Road, on May 17, and on June 23–24, 1979, the defendants, claiming to represent Etalook, constructed a barricade across the Haul Road at Mile 216, which was within Etalook's Native allotment. The defendants attempted to charge road use tolls to truck drivers using the road. When threatened with arrest, they allowed trucks to pass unimpeded.

The state filed a motion for a preliminary injunction to prevent interference with a public highway. Etalook requested that the controversy be removed to the United States District Court, but removal was denied and the case was remanded to the state superior court. After entering a pre-

---

* COOKE, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

liminary injunction, the court, on October 31, 1979, approved a permanent injunction against Etalook and the other defendants, restraining them from interfering with the Haul Road. The defendants appeal from the order entering the permanent injunction.

We hold that because this action requires an adjudication of ownership and other interests in property which is subject to a restriction against alienation imposed by the United States, the superior court did not have jurisdiction to enter the permanent injunction. 28 U.S.C. § 1360(b).

At the heart of this action is the question of whether the state has a valid easement across Etalook's Native allotment. The controlling jurisdictional statute states:

> "Nothing in this section shall authorize the alienation . . . of any real or personal property . . . belonging to any Indian . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; . . . or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

28 U.S.C. § 1360(b) (1976).[1]

■ The basis for the rights and responsibilities of the federal government in relation to Native Americans was first set forth in *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), and in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). After acknowledging that the Cherokees were a state, *i. e.*, "a distinct political society," *Cherokee Nation*, 30 U.S. (5 Pet.) at 16, 8 L.Ed. at 30; *see Williams v. Lee*, 358 U.S. 217, 218, 79 S.Ct. 269, 3 L.Ed.2d 251, 253 (1959); Chief Justice Marshall explained that Native Americans were analogous to wards of the United States. *Cherokee Nation*, 30 U.S. (5 Pet.) at 17, 8 L.Ed. at 31. In *Worcester*, Chief Justice Marshall emphasized the right of Native Americans to the territory within their distinct political communities, and that this right was guaranteed by the United States. 31 U.S. (6 Pet.) at 557, 561–62, 8 L.Ed. at 499, 501; *see* Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stan.L.Rev. 1213, 1215–18 (1975). In 1903, when South Dakota attempted to collect taxes on land improvements by the Sioux on their allotted lands, Justice Harlan noted that since the federal government caused the weakness and helplessness of Native Americans, the government had the duty and power of protection. *United States v. Rickert*, 188 U.S. 432, 437, 23 S.Ct. 478, 480, 47 L.Ed. 532, 537 (1903). This power implied "an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise." *Id.* at 439, 23 S.Ct. 481, 47 L.Ed. at 537. This line of judicial decisions led commentators to note that

> "[t]he controlling principle which prevents a [state] court . . . from exercising any power or jurisdiction to adjudicate any matter involving the transfer of any right, title, or interest in or to restricted allotted Indian lands is that the United States in the exercise of its plenary and exclusive power over the Indians and their property may adopt such measures as it may deem necessary and proper for their welfare and protection and the state courts without legislative authority have no power or jurisdiction to interfere with or circumvent those measures."[2]

---

1. 28 U.S.C. § 1360(a) provides:

    "Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory . . . ."

2. The plenary power of Congress over the affairs of Native Americans was confirmed in *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290, 301 (1974). The source of the Congressional power over Native Americans is implied from the United States Constitution and from the history of

F. Cohen, Handbook of Federal Indian Law 381 (U.N.Mex.Press 1979).

Congressional policy regarding Native Americans, following the initial explanation by the courts, has not been consistent. Tension exists between two policy objectives. The first, discussed above, insulates Native Americans from state law an continues control by the federal government. The second reflects and assimilation into American culture and includes Native Americans as citizens of the state in which they reside, thus allowing state jurisdiction over Native Americans. In 1953, Congress enacted Public Law 280, chapter 505, to reconcile the two models.[3] Although the statute, now codified in part at 28 U.S.C. § 1360, granted jurisdiction to particular states over civil and criminal actions in Indian territory and involving Indians, it expressly reserved jurisdiction over questions of interest in allotted lands.[4] The legislative history for section 1360(b) is sparse, *Bryan v. Itasca County*, 426 U.S. 373, 379, 96 S.Ct. 2102, 2106, 48 L.Ed.2d 710, 715 (1976); but the primary aim of the statute was to give the states jurisdiction to control lawlessness on Indian reservations. *Id.* at 379, 96 S.Ct. at 2106, 48 L.Ed.2d at 715–16. *See Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 661 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 718 (1977). There is even less of an explanation for the grant of civil jurisdiction, *id.* 426 U.S. at 381, 96 S.Ct. at 2107, 48 L.Ed.2d at 717; and only one mention of the reservation of jurisdiction in matters involving interest in allotted lands.[5]

Allotments are a specific part of federal policy regarding Indian advancement. *In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 296 (N.D.Cal.1977). *See Santa Rosa Band of Indians*, 532 F.2d at 665–66. Part of that federal policy is the restriction on the alienation of allotted lands until approved by a United States government official. *See* 43 C.F.R. § 2561.3(a) (1979). The approval is necessary to prevent non-Indians from taking unfair advantage of Native Americans. The Indian allotment scheme is so necessary to federal Indian policy that no state interference is permitted. *Santa Rosa Band of Indians*, 532 F.2d at 666. Because of the need to effectively implement federal policy and the long standing tradition of federal jurisdiction over the affairs of Native Americans and their lands, courts have strictly interpreted section 1360 against a broad grant of state jurisdiction over allotment lands. *See Bryan*, 426 U.S. at 381, 96 S.Ct. at 2107, 48 L.Ed.2d at 717; *Santa Rosa Band of Indians*, 532 F.2d at 661; *Chino v. Chino*, 561 P.2d 476, 478 (N.M.1977).[6]

The state alleged in paragraph III of its complaint that it received the right-of-way across the lands in question from Alyeska Pipeline Service Company, who received the right-of-way from the United States. Paragraph IV alleged that Etalook and the other defendants without "just ti-

---

dealings between the federal government and various tribes. *Board of County Comm'rs v. Seber*, 318 U.S. 705, 715, 63 S.Ct. 920, 925, 87 L.Ed. 1094, 1102–03 (1943).

3. For a longer discussion of the two policy objectives and the role played by Public Law 280, *see* Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U.C.L.A.L.Rev. 535 (1975).

4. The language in 28 U.S.C. § 1360(b) reserving jurisdiction in civil matters involving interests in allotments is similar to the language in 18 U.S.C. § 1162(b) reserving jurisdiction in criminal matters involving the same issue.

5. The Senate Report briefly noted that:
   "As introduced, H.R. 1063 would have extended the criminal laws of the State of Cali-

fornia to all Indian country within the State. Concurrently, it provided for withdrawal of the entire State from operation of the Federal Indian liquor laws; finally, provision was made for permitting the California State courts to adjudicate civil controversies of any nature affecting Indians within the State, except where trust or restricted property was involved."
S. Rep. No. 699, 83d Cong., 2d Sess., *reprinted in* [1953] U.S. Code Cong. & Ad. News 2409, 2411.

6. "[A]ny ambiguity in § 1360 should be construed in favor of the Indians...." *In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 296 (N.D.Cal. 1977).

tle, claim, right, or interest" interfered with the right-of-way. It is basic that one may not successfully move for a restraining order to prevent obstruction of an easement if one does not have proper title to or rights in the easement. *See Metzger v. Bose*, 155 Cal.App.2d 131, 317 P.2d 128, 129 (1957). *See generally* R. Powell, The Law of Real Property ¶ 420 (1979). Thus, to reach the conclusion that an injunction is proper in this controversy, the ownership of and interests in the easement which crosses Etalook's Native allotment must be adjudicated.

After the state moved for a preliminary injunction, Etalook requested removal of the action to the federal district court. Removal was denied in a memorandum opinion reasoning that the state's complaint was an action for "obstruction of a state highway under state law. Such a cause of action is within the jurisdiction of the state courts and not within the original jurisdiction of the federal courts." Denial was based on the "well-pleaded complaint" rule expressed by the United States Supreme Court in *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218, 1219–20 (1914), and reaffirmed in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 676, 94 S.Ct. 772, 781, 39 L.Ed.2d 73, 84 (1974).

█ The decision as to the removability of this action would not, of course, preclude the federal district court from accepting original jurisdiction over a separate action brought on these same facts, if the facts invoking federal question jurisdiction are alleged on the face of the complaint. Indeed, the federal court's remand order specifically notes that "[a]ny adjudication of title, claim, right or interests in an Alaska Native Allotment held in trust by the United States or a determination of compensation for inverse condemnation of a Native Allotment is within the exclusive jurisdiction of the federal courts and must be determined in a separate action in this court." Since we conclude that the state courts cannot accept this case without improperly deciding questions reserved exclusively to the federal courts, it appears that filing the

case in the federal court, with the federal questions presented on the face of the complaint, is the state's proper course if it wishes to pursue the matter further.

We have confronted issues of trust land ownership before. In *Ollestead v. Native Village of Tyonek*, 560 P.2d 31 (Alaska), *cert. denied*, 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977), Ollestead sought a declaratory judgment entitling her to land rights in the town of Tyonek as a member of a Native village corporation under 25 U.S.C. § 477. *Id.* at 33. We held that "[a] state court adjudication of questions of tribal membership would necessarily encompass issues of ownership or right to possession of property held in trust and subject to restrictions on alienation." *Id.* at 36. Thus we concluded that the state court lacked jurisdiction under 28 U.S.C. § 1360. In *Calista Corporation v. Mann*, 564 P.2d 53 (Alaska 1977), Mann sought a declaratory judgment entitling her to shares of stock in two native corporations as the adopted daughter of a deceased shareholder. *Id.* at 55. The ownership of stock was at the center of the controversy and by operation of 43 U.S.C. § 1606(h)(1) the stock was trust property within 28 U.S.C. § 1360(b). "Thus, absent a conferral of jurisdiction by the United States, other than 28 U.S.C. § 1360," we held that the state courts were without jurisdiction in that case. *Id.* at 58. In this action for injunctive relief, the determination of rights to an easement over a Native allotment is the center of the controversy. Consistent with the decisions in *Calista Corporation* and *Ollestead*, we hold that the courts of this state lack jurisdiction to adjudicate those rights.

The permanent injunction entered by the superior court on October 31, 1979, restraining the defendants from interfering with the Haul Road is vacated and the case is remanded to the superior court with directions to dismiss for lack of jurisdiction.

REVERSED and REMANDED.

MATTHEWS, Justice, with whom COOKE, Judge, joins, dissenting.

Issuance of an injunction under the facts of this case is consistent with the classic

purposes of injunctive relief: maintenance of public order and peace, and of the status quo, pending adjudication of legal rights.[1]

The federal district court's memorandum order denying removal stated that the state's complaint presented "only a cause of action for obstruction of a state highway under state law. Such a cause of action is within the jurisdiction of the state courts and not within the original jurisdiction of the federal courts." *State of Alaska v. Heffle*, No. F79–23 (D. Alaska, July 24, 1979). However, the court went on to explain:

> The state courts do not have jurisdiction to adjudicate title, claim or rights to interests in property held in trust for Alaskan Natives. *Ollestead v. Native Village of Tyonek*, 560 P.2d 31, 33–34 (Alaska 1977); *Atkinson v. Haldane*, 569 P.2d 151, 167 n. 59 (Alaska 1977). *Cogo v. Central Council of Tlingit and Haida Indians of Alaska*, 465 F.Supp. 1286, 1290 (D. Alaska 1979); *State of Alaska v. Agli*, 472 F.Supp. 70 (D. Alaska, 1979). 28 U.S.C. § 1360(b). Any adjudication of title, claim, right or interests in an Alaska Native Allotment held in trust by the United States or a determination of compensation for inverse condemnation of a Native Allotment is within the exclusive jurisdiction of the federal courts and must be determined in a separate action in this court. *Minnesota v. United States*, 305 U.S. 382, 389 [59 S.Ct. 292, 295] (1939). *McKay v. Kalyton*, 204 U.S. 458 [27 S.Ct. 346, 51 L.Ed. 566] (1907). *United States v. Clarke*, 590 F.2d 765 (9th Cir. 1979). *State of Alaska v. Agli*, 472 F.Supp. 70 (D. Alaska 1979).

*Id.*

The majority opinion concludes, based on its reading of 28 U.S.C. § 1360 (1976), that because state courts have no jurisdiction to adjudicate title to Native land, they also lack jurisdiction to enjoin obstruction of a highway over Native land. I disagree.

In prior cases we have construed § 1360 to preclude state court jurisdiction to grant the declaratory relief sought, on the grounds that it would necessarily implicate questions of title to trust property. *Ollestead v. Native Village of Tyonek*, 560 P.2d 31 (Alaska 1977), *cert. denied*, 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977); *Calista Corporation v. Mann*, 564 P.2d 53 (Alaska 1977).

However, an injunction differs from a declaratory judgment, in that ownership rights to property are not necessarily affected. Many courts have held in a variety of contexts that where title is in dispute and resolution of the dispute is pending in another forum, the court may grant a conditional injunction to preserve the status quo upon a prima facie showing of title or of present possession. The injunction is vacated if title is eventually determined adversely to the party in whose favor it runs.

In a case closely analogous to the present case, *Zimmerman v. McCurdy*, 15 N.D. 79, 106 N.W. 125 (1906), the North Dakota Supreme Court held that where competing claims to federal land were pending before the Land Department, which had exclusive jurisdiction over the question of title, an injunction in state court was proper to maintain the status quo and to protect the occupying claimant's possession against the other claimants' attempts to take forcible possession, until their respective rights could be determined by the federal agency. The court stated:

> The rightful claimant's possession or right to possession will always be protected or enforced against a trespasser by the appropriate action in court when that can be done without deciding a controversy of which the Land Department has exclusive jurisdiction. [Citations omitted].

---

**1.** *See Houck v. Kroger Co.*, 555 S.W.2d 803, 806 (Tex.Civ.App.1977); *Chapple v. Hight*, 161 Ga. 629, 131 S.E. 505, 506 (1926). *See also Owens v. Texaco, Inc.*, 368 S.W.2d 780, 782–83 (Tex.Civ.App.1963) ("the last prior peaceable, exclusive possession of land will be upheld by the court so that the status quo may be protected until trial on the merits. Courts frown on self-help; to encourage the action on the part of defendants ... in this case is to encourage breaches of the peace, friction and bloodshed. [Citations omitted].")

When, however, as in this case, the opposing claimant's rights are in litigation before the federal Land Office, and the courts have, therefore, no jurisdiction to decide which of the two opposing parties is the rightful claimant, the courts are not powerless to extend their aid to preserve the property and prevent destructive violence. The equity powers of the courts are sufficiently broad and elastic to do justice under such circumstances, without interfering with the jurisdiction of the federal Land Office officials to determine the ultimate rights of the claimant with respect to the land in controversy. Inasmuch as the plaintiff is in possession, and is contesting in the proper tribunal the validity of defendant's entry, upon which the latter's right to take possession depends, it is clearly improper for defendant to violently dispossess plaintiff until the final result of the contest shall have disclosed which of the two have the better right.

*Id.* at 126.

In *Mid-Continent Pipe Line Company v. Emerson*, 396 P.2d 734 (Okla.1964), there was no question of the state court invading federal jurisdiction, but there was a question of whether an owner of a pipeline right-of-way could enjoin the owner of the servient estate from interfering with its possession, where title was unclear. Stressing that the plaintiff was not asking that its title be determined but asking only for an injunction, the court stated:

In the instant case Mid-Continent had been in peaceable possession of a portion of defendants' land for nearly two and one-half years. It was the defendants who were out of possession and sought to regain possession . . . .

Whether defendants will be able to regain possession in a subsequent proceeding, or will be limited to an action in reverse condemnation, is not a decisive issue in this case and is not determined. We do hold that a threat of force and violence is not a proper remedy to obtain possession and such action should be enjoined.

Unless an injunction is granted in this case the damages to be sustained by plaintiff and those whom it serves will be substantial. Plaintiff's possession should be maintained until the substantive and permanent rights of the parties may be determined by appropriate proceedings.

*Id.* at 736. Like the *Zimmerman* court, the court in *Mid-Continent* emphasized the fact of peaceable possession and the need to preserve the status quo.

Other authorities which hold that courts have jurisdiction to maintain the status quo until underlying questions of title, pending in a separate forum, are resolved are set forth in the margin.[2]

The injunction issued by the superior court should be modified to provide that it shall be of no force or effect in the event the B.I.A. does not confirm the right-of-way agreement. As so modified the injunction would be consistent with § 1360, as well as the policies underlying that statute. § 1360(a) provides state courts with jurisdiction to grant general equitable relief within "Indian country." That jurisdictional grant is qualified only to the extent that "rights to possession or ownership" of trust lands are being adjudicated. As used in 1360(b), "possession" is properly read as essentially the equivalent of title, and not possession in the conditional sense at issue here. The right to possession has been the greatest ownership interest available to Native Americans with respect to much of their land, with legal title remaining in the

**2.** *Northern Pacific Ry. Co. v. McComas*, 250 U.S. 387, 391, 39 S.Ct. 546, 547, 63 L.Ed. 1049, 1053 (1919); *Park & Tilford Import Corp. v. Hunter Baltimore Rye, Inc.*, 5 F.Supp. 888, 889 (S.D.N.Y.1933); *Olive Land & Development Co. v. Olmstead*, 103 F. 568, 580 (S.D.Cal.1900); *Northern Pacific Ry. Co. Soderberg*, 86 F. 49, 51 (N.D.Wash.1898); *Ex Parte Finley*, 20 So.2d 98, 100 (1944); *Mobile & B. Ry. Co. v. Louis-ville & N. Ry. Co.*, 190 Ala. 417, 67 So. 244, 245–46 (1914); *Mengel & Bro. v. Norman*, 144 La. 632, 81 So. 207 (1919); *Smith v. Shiebeck*, 180 Md. 412, 24 A.2d 795, 799 (1942); *Rockaway Rolling Mill Corp. v. Delaware, L. & W. Ry. Co.*, 101 N.J.Eq. 192, 137 A. 650, 652 (1927) *aff'd*, 103 N.J.Eq. 297, 143 A. 334, 335 (1928); *Elliott v. Rich*, 24 N.M. 52, 172 P. 194, 195 (1918).

federal government,[3] and so § 1360(b) would have been ineffective to broadly protect Indian interests if only the term "ownership" had been used.

Although there is "sparse" evidence of the legislative intent behind § 1360,[4] it is reasonably clear that the bar of state interference with Indian trust land embodied in § 1360(b) was considered necessary for the effective administration of federal Indian policy,[5] and particularly for the preservation of Indian property.[6] The injunction issued in this case, as modified, would not have the potential to frustrate these purposes.

Moreover, the district court's decision in *State of Alaska v. Heffle*, No. F79–23 (D. Alaska, July 24, 1979), construed § 1360(b) as not precluding the injunctive relief sought by the state in this case. This decision by a federal court interpreting a federal statute, while not binding upon this court under the supremacy clause, is nonetheless persuasive authority. It also may be considered as establishing the law of the case. *See United States ex rel. Lawrence v. Woods*, 432 F.2d 1072 (7th Cir. 1970); 1B Moore's Federal Practice § 0.404[6] 501, 502 (2d ed. 1980). And, while the law of the case doctrine permits departure from earlier rulings where clearly warranted, such rulings should in the great majority of cases be adhered to in order to impart a measure of order to litigation. This is especially true with respect to rulings as to which of two courts should hear a particular case; otherwise an unseemly, costly, and time consuming shuttling of cases between courts—the situation here—will result.

For these reasons the injunction issued by the superior court should be modified to be made conditional on the B.I.A.'s decision concerning the right-of-way agreement; as so modified the injunction should be affirmed.

---

**3.** *See, Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314, 320 (1955); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 666 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). *See also*, F. Cohen, *Handbook of Federal Indian Law*, at 411–12 (1942).

**4.** *Bryan v. Itasca County*, 426 U.S. 373, 379, 96 S.Ct. 2102, 2106, 48 L.Ed.2d 710, 715 (1976); *Atkinson v. Haldane, supra* at 165. As one commentator views it, "[m]ost likely, civil jurisdiction was an afterthought in a measure aimed primarily at bringing law and order to the reservations, added because it comported with the pro-assimilationist drift of federal policy, and because it was convenient and cheap." Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U.S.C.A.L.Rev. 535 at 543–44 (1975).

**5.** *See United States v. Humboldt Fir, Inc.*, 426 F.Supp. 292, 296 (N.D.Cal.1977); Cohen explains the rationale behind this policy:

The controlling principle which prevents a court, whether state or federal, from exercising any power or jurisdiction to adjudicate any matter involving the transfer of any right, title, or interest in or to restricted allotted Indian lands is that the United States in the exercise of its plenary and exclusive power over the Indians and their property may adopt such measures as it may deem necessary and proper for their welfare and protection and the state courts without legislative authority have no power or jurisdiction to interfere with or circumvent those measures. F. Cohen, *supra*, at 381 (footnotes omitted).

**6.** *See Santa Rosa Band of Indians v. Kings County*, 532 F.2d at 664; *see also* Comment, *Indian Taxation: Underlying Policies and Present Problems*, 59 Cal. L. Rev. 1261, 1266-74 (1971); Israel & Smithson, *Indian Taxation, Tribal Sovereignty & Economic Development*, 49 N.D.L.R. 267, 283 (1973).