65 So.2d 547 (1953)
ROBERTS
v.
CAUGHELL et al.
Supreme Court of Florida, en Banc.
April 28, 1953.
Rehearing Denied June 23, 1953.
Frank W. Stebbins, Eustis and Richard F. Stevens, Cleveland, Ohio, for appellant.
T.C. Cork, Clermont, for appellees.
PER CURIAM.
Appellees Ruth Ann Caughell and William Charles Caughell are two minor children about fourteen years of age. When they were infants their father Albert L. O'Berry gave them to Charles W. Caughell and his wife Etta Catherine Caughell to raise and educate as their own and to "adopt said minors in accordance with the laws of the State of Florida." Charles W. Caughell died testate June 17, 1945, leaving all of his property to his wife. Etta Catherine Caughell died intestate February 27, 1949, and appellant was appointed administratrix of her estate.
This suit was brought by appellees against appellant as defendant. The bill of complaint prayed that the Court decree payment of such sums as are essential to the care of said minors, from the estate of Charles W. and Etta Catherine Caughell, and that said amount be placed in the hands of Raymond O. Matz and Mary June Matz, their next friends and custodians for their support and maintenance. A motion to dismiss was overruled and this appeal was prosecuted from the final decree.
The ultimate point for determination is whether or not under the facts revealed, appellees are entitled to participate in the estate of Etta Catherine Caughell, their foster mother, regardless of the point raised as to their legal adoption.
It is shown that appellees were placed in the hands of Charles W. and Etta Catherine Caughell when they were infants for the purpose of adoption and that a contract or agreement was made with their father (their mother being deceased) for that purpose. The agreement was a voluntary one. The Caughells took appellees *548 into their home, changed their names to "Caughell", had them baptized in their faith (Catholic) and brought them up as if they were their own. They are now about fourteen years of age and are well into the formative period of life, if they have not passed it. They know no other parents and so far as the record discloses have been well cared for. The Caughells performed every parental duty and created that mutual love and respect that should exist between parent and child.
An agreement for adoption was unquestionably entered into between the father of the children and the Caughells. It has to all intents and purposes been carried out. Whether the legal technical requirements have been met may be questionable, but that is not the primary consideration. The important question concerns the welfare of the minor children and whether or not the agreement of the Caughells to bring up the minors properly has been performed. When that is so conclusively shown, as it is here, the minor child is in equity entitled to enforce the agreement with reference to his property rights. The minors in this case were voluntarily surrendered by their father and the adopting father and mother have met every condition contemplated by the agreement to raise and bring up. In other words there has been performance to date, so if it be required that such contracts be in writing to meet the Statute of Frauds (which we do not decide), performance has relieved the present contract of that requirement. Sheffield v. Barry, 153 Fla. 144, 14 So.2d 417; R.C.L. Vol. 1, page 617.
We think the record amply justifies affirmance of the chancellor's decree. Any other answer to the question posed would do an inordinate injustice to the minor children. The decree appealed from is therefor affirmed.
Affirmed.
TERRELL, THOMAS and HOBSON, JJ., and HOCKER, Associate Justice, concur.
ROBERTS, C.J., and SEBRING and MATHEWS, JJ., dissent.
MATHEWS, Justice (dissenting).
This appeal is from a final decree determining that two minors, Ruth Ann Caughell and William Charles Caughell, are the legal heirs of Etta Catherine Caughell, deceased, and decreeing and ordering that the estate of Etta Catherine Caughell remaining after the payment of debts and costs be paid to the legal guardian for the said minors.
The final decree was based upon certain findings of fact and conclusions of law of the Chancellor that the facts and circumstances as established by the acts and conduct of the parties authorized a logical inference that an agreement to adopt the minor children existed.
The amended bill of complaint alleges that Charles W. Caughell and his wife, Etta Catherine Caughell, "by agreement with one Albert L. O'Berry * * * the father and surviving parent of the above named minors" took into their custody and care the two minors and undertook to assume the obligation of rearing, providing for, training and educating the said minors, and "promised to adopt said minors in accordance with the laws of the State of Florida." It was alleged that Charles W. Caughell died on the 17th day of June, 1945, and Etta Catherine Caughell died on the 27th day of February, 1949. Charles W. Caughell died testate leaving all of his property to his wife, Etta Catherine Caughell, and Etta Catherine Caughell died intestate. The suit was against the administrator of the estate of Etta Catherine Caughell.
The Caughells lived in the State of Michigan where Captain Caughell was engaged in some capacity in operating steamboats on the Great Lakes. They spent their winters at Clermont in Lake County, Florida. The amended bill alleges that the minors were taken into the home of the Caughells and reared, cared for and educated by the Caughells, but that Charles W. Caughell died without having performed his agreement to adopt and Etta Catherine Caughell died without ever having performed "the *549 same on her part." At other places in the amended bill of complaint it is alleged that "Charles W. Caughell and Etta Catherine Caughell, his wife, entered into the agreement to adopt said minors." After reciting the various details, the amended bill then prays that the Court will enter a decree that the minors "are the legal heirs of the said Etta Catherine Caughell, deceased, and as such are entitled to the estate of the said Etta Catherine Caughell."
A motion to dismiss the amended bill of complaint was filed and in due course argued before the Court below, and the Chancellor entered an order denying the motion to dismiss. From reading the order of the Chancellor, it is clear that his decision and order was based upon the case of Sheffield v. Barry, 153 Fla. 144, 14 So.2d 417, because in the order the Chancellor said:
"The Supreme Court of Florida, in the case of Sheffield v. Barry, 153 Fla. 144, 14 So.2d 417, held that a Court of equity in cases such as this, could apply the equitable maxim; `Equity regards that as done which should have been done,' * * * `because of the distinction  fine, nevertheless recognized by the authorities  between an action for specific performance to enforce the original contract thus placing the plaintiff in a position to profit from an intestate estate and specific performance to declare adoption effectual because legal proceedings to that end should have been instituted.'
"The facts mentioned and alleged in the above mentioned case were very similar to the facts alleged here, and in this case, as in the case of Sheffield v. Barry, supra, such rights as the plaintiffs may have to participate in the estate in question are founded on the contract to adopt, although that contract was incidental to the relationship which the Caughells became obligated to establish by appropriate statutory proceedings for adoption."
The allegations of the bill of complaint in the case of Sheffield v. Barry, supra, and those in the case at bar are very similar. In the case of Sheffield v. Barry, supra, nothing was presented to or decided by the Court except the sufficiency of the bill of complaint. No testimony had been taken. In the case at bar we have presented not only the sufficiency of the allegations of the amended bill of complaint, but also the sufficiency of the testimony to prove the material allegations of the bill of complaint. In the case at bar the final decree was based upon the amended bill of complaint and the testimony in support thereof. In the case of Sheffield v. Barry, supra [153 Fla. 144, 14 So.2d 418], the opinion of the Court was based solely upon the allegations of the bill of complaint. The material allegations of the bill of complaint in that case were summarized in the opinion of the Court as follows:
"Plaintiff in the chancery court brought her suit against the administrator of the estate and against Cora C. Wittstock, whom Alexander E. Wittstock had married shortly before his death. In order fully to understand the issues, it is well to review the history of the relationship between the plaintiff on one hand and Alexander Edward Wittstock and his first wife, Sarah Wittstock, on the other, as it is detailed in the bill. In 1892, when the plaintiff was only three months of age, Sarah Wittstock requested that she and her husband be permitted to adopt the child as their own. The Wittstocks had no children and the mother was impecunious. Parenthetically, the identity of the father does not appear in the pleadings. In these circumstances, the `mother consented to permit the adoption' and the Wittstocks `promised and agreed with (the mother) * * * to adopt (the child) in consideration of the complete surrender by (the mother) to them.' Relying upon this promise the mother delivered the child to the Wittstocks with the understanding that she was to be their child; that they would adopt her `as their own'; and that the mother was `forever to surrender any and all parental rights' or control over the infant. In furtherance of this agreement the Wittstocks took *550 the plaintiff into their home and gave her the name of Cora Wittstock. She became a member of the family and was at all times a dutiful, loving and well behaved daughter, rendering to her foster parents the same service which one would give to natural parents. When she was sixteen years of age she married in the home of the Wittstocks in the presence of guests who received written invitations from them to attend the `marriage of their daughter Cora Mabel.' The plaintiff was `treated and considered by her adopted parents throughout their lives as their daughter and was by them represented to the community in which she lived as being (their) lawfully adopted daughter * * *'. Also, throughout their lives she was told by them that she bore this status and she believed that the adoption had been legalized until shortly after the death of Alexander Edward Wittstock when she learned that no proceedings had ever been instituted to that end." (Emphasis supplied.)
There are some material differences between the allegations of the bill of complaint in the case of Sheffield v. Barry, supra, and the case at bar which were pointed out by the Court in its opinion in the Sheffield v. Barry case when it was said:
"Besides the performance on the part of the natural mother and the child and the partial failure on the part of the foster parents, an important feature of the facts outlined in the bill of complaint is the intestacy of the foster father, for had he left a will this suit would be purposeless."

In the case at bar the alleged foster father left a will. This was found to be a fact by the Chancellor when he found "Charles W. Caughell died testate leaving all his property to his wife, Etta Catherine Caughell." Even though it may be admitted that Charles W. Caughell agreed to adopt the two minor children, it is essential, in order to establish the fact that the minors are the legal heirs of Etta Catherine Caughell, deceased, that it be established by a preponderance of the evidence that she entered into the agreement to adopt the said minors as alleged in the amended bill of complaint. In the case of Sheffield v. Barry, supra, the Court decided nothing more than that if the substantial allegations of the bill of complaint were substantiated by the evidence, the plaintiff should be awarded a decree. The Court said:
"If the plaintiff substantiates by evidence the allegations with reference to the execution of the contract, the performance on the part of her mother and herself, the partial performance by her foster parents and the intestacy of her foster father she should be awarded a decree." (Emphasis supplied.)
It, therefore, becomes necessary that we examine the evidence in order to determine if the minors have substantiated by evidence the material allegations of the amended bill of complaint.
The minors right to participate in the estate of Etta Catherine Caughell has its foundation in the contract and we should first consider whether or not there was a contract on the part of Mrs. Caughell. In the case of Sheffield v. Barry, supra, the Court held:
"* * * Her right to participate in the estate of Alexander Edward Wittstock had its foundation in the contract, although it was incidental to the relationship which he became obligated to establish."
There is no contention that there was any contract of any kind prior to February 9, 1941, which was the date when it is claimed a written instrument was delivered to Mr. Caughell reading as follows:
 "Orlando, Fla.
 Feb. 9, 1941
"I hereby sware that on this date I surrender the custody of my two children Creacy Ruth and Robert William to Mr. and Mrs. Charles Caughell to raise as they see fit religiously an_ socially, as their Mother is deceased and they are subject to adoption.
 "/s/ Albert L O Berry
 "Witnessed by /s/ Minnie O. Rouse."
(Emphasis supplied.)
*551 The natural father, O'Berry, testified that prior to February 9, 1941, there was only one conversation with the Caughells concerning adoption. With reference to that one conversation the following question was asked and answer given:
"Q. As a matter of fact, was there not quite a scene there, and some confusion the first time that they came out there? A. Well, there was a little bit, I was drinking some that afternoon, and I told them at first that since I thought they were Catholics, I told them that I did not want the children raised up to be Catholics in a Catholic home, that is what I told them, and that is all there was to it."
He further testified that he had two other children and neither of them had been adopted.
With reference to the paper dated February 9, 1941, while Mr. O'Berry was testifying the following took place before the Chancellor:
"Q. Now, where was that paper signed? A. Well, it was signed east of Orlando, at the place where I was living at that time; it was nine miles east of Orlando, I was living there.
"Q. And did you personally deliver this paper to Mr. and Mrs. Caughell at the time that you wrote and signed it? A. Yes, I delivered it to him.

"Q. Was Mrs. Caughell present? A. Yes, she was, but she was busy talking with the children, and I don't know whether or not she was paying any attention to what we were doing, but I delivered it personally to Mr. Caughell.
"Statement by Mr. Cork: May it please the Court, the allegations of the Bill of Complaint are that the Caughells entered into an agreement with the father of these children, who is now the witness on the stand, and that the Caughells took into custody and carried away the children which are the minor parties to this suit, and we further allege that any agreement made between the Caughells was verbal, because of the fact that at the time that I filed the Bill of Complaint in this cause I did not know of the existence of this written statement, but it has since that time come into my possession, and I therefore respectfully urge that it be received in evidence as Plaintiff's Exhibit Number 1.
"Mr. Stebbins: May it please the Court, we renew our objection.
"The Court: The statement will be received in evidence as Plaintiff's Exhibit Number 1; I am going to overrule the objection.
"The Said Exhibit was received in evidence as Plaintiff's Exhibit Number 1.
"Q. Now, at the time that they took the children they took them without any definite understanding that you would not consent to the adoption? A. That is correct, they understood that I did not consent to it at that time.
"Q. And you stated that you handed that piece of paper to Captain Caughell, where was he when you handed that paper to him? A. He was at the place where I was living, that is where we were talking.
"Q. Was Mrs. Caughell present? A. She was there; I do not know whether she was paying any attention or not, but she was there.

"Q. Now, after you came out of the service, did you have any conversation with Captain Caughell or Mrs. Caughell regarding the adoption of these children? A. I do not believe I ever talked to him about it.
"Q. Did you have any conversation with Mrs. Caughell? A. Yes, but I don't believe she ever mentioned anything about the adoption.

"Q. Did you know they have not been adopted as a matter of fact? A. Well, I knew that I did not sign any papers.
"Q. And when they came there on February 9, and Mr. Caughell asked you to write that paper? A. No. he didn't; he said he would like to know if it would be all right if they adopted *552 them, and I told them that I was satisfied, and that it was all right for as far as I was concerned, for them to adopt the children, and I voluntarily wrote out that paper.
"Q. You wrote the paper out yourself? A. Yes, I did.
"Q. Was Mrs. Rouse, your sister, there? A. Yes, she was." (Emphasis supplied.)
Mrs. Minnie O. Rouse, sister of Mr. O'Berry, was present at the time it is alleged the paper was delivered to Mr. Caughell. She was asked the following questions and gave the following answers:
"Q. Were you present when that paper was signed by your brother and which you have signed as a witness? A. Yes, I was present.
"Q. And that is the date it took place, the date which is shown on the paper? A. Yes, it was in February, I know that.
"Q. And at that time Mr. O'Berry did agree that the Caughells should keep the children permanently, is that correct? A. Yes, he did.
"Q. And you are sure and positive that the understanding was that at that time, at the time that this paper was written and the children were turned over to them, that it was the intention and purpose and desire of the Caughells to adopt them?
"Mr. Stebbins: We object to that question. If she knows, it would be all right, but we are not interested in what her understanding was, because the understanding of the Witness is only a conclusion, if she was not present at all of the conferences.
"The Court: The objection is overruled. She was there when the paper was made.
"The Witness answering the question: A. It was always my understanding and believe that it was their desire and intention to adopt the children." (Emphasis supplied.)
On cross-examination Mrs. Rouse testified as follows:
"Q. Did you say Mr. O'Berry wrote that paper? A. Yes, he did.
"Q. Did you see him write it? A. Yes, I did.
"Q. To whom did he deliver that paper? A. He gave the paper to Mr. Caughell, I think, I am not sure, I don't know exactly which one he gave it to.
"Q. Was there ever any conversation in your presence between Mr. and  Mr. O'Berry and Mrs. Caughell regarding the adoption of these children, on February 9? A. I don't know about that, I don't know any of the details about that, I know they had talked about it, but I can't remember the exact words that were used, I know she asked him if he would agree to it, and he said he was satisfied, I don't remember the exact conversation but it was along those lines." (Emphasis supplied.)
The above constitutes all of the material testimony concerning the writing and delivery of the paper to Mr. Caughell. It should be noted that no one testified that the paper was ever delivered to Mrs. Caughell, shown to her or that the contents were explained to her. Much of the testimony with reference to this matter concerns the "understanding, impression or belief" of the witnesses rather than any direct statement by either of the Caughells or O'Berry showing a contract or an agreement. If it be conceded that there was a meeting of the minds between O'Berry and Mr. Caughell, or any definite agreement, as to the adoption of the children such as that he would adopt them as his children or would adopt them as his own, such contract or agreement as shown by this testimony was not binding upon Mrs. Caughell.
Even if a deed of adoption was recognized in this state, the fact that a wife did not join in the deed of adoption does not effect the validity of the adoption as to the husband, although as to the wife not so joining the adoption deed is void. 2 C.J.S., article on Adoption of Children, § 30, subsection *553 (b), p. 408; Haworth v. Haworth, 123 Mo. App. 303, 100 S.W. 531.
Even had Mrs. Caughell attempted to agree to the adoption of the children it may be that such agreement was void for want of power to bind herself unless the agreement was further performed in the manner provided by the statutes by the filing of a sworn petition. At the time of the alleged contract on February 9, 1941, the common-law disabilities of coverture had not been removed in this state. See Austin v. Davis, 128 Ind. 472, 26 N.E. 890, 12 L.R.A. 120, 25 Am.St.Rep. 456; Carroll's Estate, 219 Pa. 440, 68 A. 1038, 123 Am.St.Rep. 673. However, having reached the conclusion which we have, it is unnecessary for us to decide whether or not the common-law disabilities of coverture unremoved denied her the power to bind herself by contract.
In addition to the testimony as to what actually took place on February 9, 1941, when the paper in question was claimed to have been delivered to Mr. Caughell, the plaintiffs below, appellees here, offered other testimony showing the "understanding," or the belief or the impression of other witnesses as to the intent of the Caughells.
In his findings of fact upon which the final decree was based the Chancellor placed particular stress upon the testimony of Mrs. Paul, Mrs. Matz and Captain Roy Caughell when he stated:
"Mrs. Paul, an adopted daughter of Mr. Caughell, understood that the children were to be adopted. She was a frequent visitor in the Michigan home of the Caughells, before and after the children were taken in by the Caughells.
"Another adopted daughter of Mr. Caughell, Mrs. Mary June Matz, who was also a frequent visitor in the Caughell home before and after the children entered the home, understood that the children were to be adopted.
"A relative of Mr. Caughell, Captain Roy Caughell, was a frequent visitor in the home, and he understood that the children were to be adopted." (Emphasis supplied.)
Mrs. Julia C. Paul was a witness for the plaintiffs. She did not testify directly before the Chancellor but she did testify by deposition. She was reared by Mr. Caughell, but from the testimony was never legally adopted by him. She testified that she heard Mr. Caughell express an intention with reference to the adoption of the two children on times "too numerous to mention". She was asked the question if she had ever heard Etta Catherine Caughell, following the death of Charles Caughell, express any intention with regard to these same children. She answered, "Yes". The following then took place:
"Q. Can you place the time of having heard such a statement? A. Yes, I would say at the time of my father's death.
"Q. When was than, Mrs. Paul? A. The day after his death she definitely stated to the children  they asked her  shall I state this?
"Q. Yes.
"Mr. McAllister: Let the record show we object to this testimony.
"A. They asked her in the event of their foster father's death if they would be sent back to their own people, and Mrs. Caughell definitely stated that that was the farthest thing from her mind. As far as she was concerned they are the prime reason for her living, and her object in life for living.
"Q. You were present when those statements were made? A. Yes."
Mrs. Paul also testified that her father died June 16, 1945, and that during the period of time from 1941 to 1945, he resided in Harbor Beach, Michigan, and that the children accompanied them to Florida each year. It should be especially noted that Mrs. Paul gave no testimony concerning any statement made by Mrs. Caughell as to the adoption of these children, or making these children her legal heirs.
Mrs. June Matz, also one of the witnesses whose testimony was particularly relied upon by the Chancellor, was one of the children reared by Mr. Caughell. She testified that she had possession of the children *554 at the time the suit was instituted and had such possession for three years prior to the taking of the testimony. She was asked if Mr. Caughell ever discussed his intentions regarding these children and the following took place before the Chancellor:
"A. He only said that they were adopted, and he would say so about the same way he said so to me whenever I ever asked him as a child, and when I would he would say to me, `Yes, you are adopted.'
"Q. Then, it was your definite understanding that these two children, Ruth Ann and Billy Caughell, were adopted children? A. Yes, that was my understanding." (Emphasis supplied.)
The only other testimony of Mrs. Matz' of any importance was that all of the property belonging to the estate of Mrs. Caughell came through her deceased husband, Mr. Caughell.
Captain Roy Caughell was another witness whose testimony was particularly pointed out by the Chancellor and upon which he relied. Captain Roy Caughell was a cousin of Charles Caughell and while he was testifying before the Chancellor, the following occurred:
"Q. And as a matter of fact, did Captain Caughell ever express to you his intentions regarding these children? A. His intentions as I gathered from his actions and conversations with me, was to take care of those children, and it was also apparent, and it was also my understanding that the ultimate intention was for the adoption of the two children, whether or not the adoption was ever accomplished I do not know, but I do know that insofar as regarding the care and love which was given the children and the name which was given them, of the name of Caughell, very definitely would all lead one to believe that that was the purpose and intention, in other words adoption was the ultimate goal.

"Q. Now, Captain Caughell, could you point out or describe any particular time or place in which you had a conversation in which that definite intention was manifested? A. Well, regarding any as far as I can recall, it would be almost impossible, because I was in his home many many times, and we visited back and forth between the two homes very often, and I cannot recall any definite words or conversations, but of course, I knew what his intentions in the matter were.

"Q. Did Mrs. Caughell ever express any intention or desire to adopt the children? A. Well, I just cannot recall any particular incidents or conversation other than the fact that I knew she was in accord with the desires and wishes of both of them; I cannot state an exact or specific occasion, or put any definite words in her language  any definite words or put them in her language, but it was always my understanding, from what I heard her say and from her attitude that she had the same desire and was continuing in the same line of thought as they both had prior to his death * * *." (Emphasis supplied.)
On cross-examination in response to the question if Captain Charles Caughell ever stated in so many words that it was his intention and purpose and desire to adopt the two children, Captain Caughell answered as follows:
"A. Well, insofar as directly making that statement to me, I cannot say that he did, and if you could have seen their attitude toward the children and the children's attitude toward them, you would have seen by those actions that it was their intention to adopt the children."
Captain Roy Caughell was then asked:
"Q. Then, as a matter of fact, you gathered your impressions more from their conduct toward the children more than any actual statements they made to you, is that correct? A. No, their words as well, as I said, although they did not expressly say so, it was certainly implied at all times." (Emphasis supplied.)
*555 It developed from Captain Roy Caughell's testimony that Captain Charles Caughell, prior to the death of his first wife, had reared four other children but had never legally adopted them. With reference to the other four children the following question was asked and answer given:
"Q. Now, as a matter of fact, these other four children that they raised, did not they give them the same type of care and attention and treatment and maintenance as they did these children? A. Well, very much so, very much like that, it would be a fact, their conduct with any children was much the same, they loved all children very deeply."
On further cross-examination the following appears:
"Q. The truth of the matter is, is it not, that you actually do not have any direct discussion with him, at any time, with reference to whether or not he was going to adopt the children? A. Well, no, I didn't myself." (Emphasis supplied.)
Although the testimony of Mrs. Della Clapper was not specially mentioned by the Chancellor in his findings of fact, Mrs. Clapper did testify on cross-examination as to what was said in a conversation with Mrs. Caughell immediately after the death of her husband, when in response to the question was Mrs. Caughell concerned as to how she would take care of the children after his death, she answered:
"A. Well, I don't think she was; she was talking to me about the future, and she was saying if there was anything left when the kids were raised and educated, if anything was left, she said I am going to divide it evenly among the four children, the other two and these two, and if anything is left when I am gone is what she said, and she definitely made the statement to me that after she was gone and didn't need the money any more, that all of the four children would participate and she wanted to divide it evenly among them."
The testimony of other witnesses offered by the plaintiffs did not show any conversation where Mrs. Caughell at any time expressed any intention of adopting these children. They testified as to her general love of children and these children in particular, as to her conduct toward these children and as to their understanding, belief or impression as to what she desired or intended to do. Contracts to adopt children must stand on firmer ground than the understanding, belief or impression of witnesses.
A wrong rule of evidence was applied in this case. Understanding, belief or impression of witnesses cannot be substituted for direct and positive testimony as to what a person said or did. There is no testimony in this case that Mrs. Caughell at the time of the alleged delivery of the paper to Mr. Caughell saw the paper, knew the contents of the paper, had the paper explained to her or agreed to adopt the children. The bill of complaint should have been dismissed.
At the time of the alleged contract to adopt Section 1536 et seq. of the Revised Statutes of Florida, now Section 72.01 et seq., Florida Statutes 1941, were in full force and effect and such sections of the Statutes and the opinions of this Court construing the same are applicable in this case.
Chapter 21759, Laws of Florida 1943, which is now Section 72.07 et seq., F.S.A., repealed Section 72.01 et seq., Florida Statutes 1941, and was a complete revision or recodification of the laws of Florida with reference to the adoption of minor children. This new law adopted in 1943 changed to some extent the public policy of the state with reference to the adoption of minors. It contains elaborate provisions for the protection of the natural parents, the foster parents, and the child and requires that State Welfare Agencies be a party to every proceeding for the adoption of minors. One of the main purposes of the Act was to stop or curb the trading and trafficking in minors and to require that such questions as the custody and adoption of minors be under the supervision of State *556 Welfare Agencies. It contains many provisions which appear to be jurisdictional not contained in the prior law which were not complied with and could not be complied with by Mr. O'Berry on Mr. and Mrs. Caughell. We have not attempted to apply the new law to this case because this proceeding is based upon an alleged contract at a date prior to the effective date of Chapter 21759, Laws of Florida 1943.
The decree should be reversed and dismissed.
ROBERTS, C.J., and SEBRING, J., concur.