CALISTA CORPORATION, Appellant,

v.

Katie MANN and Catherine Peters, Appellees.

No. 2800.

Supreme Court of Alaska.

May 6, 1977.

---

Hal R. Horton, Anchorage, for appellant.

Donald C. Mitchell, Bethel, for appellees.

Before BOOCHEVER, C. J., and RABI-NOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

ERWIN, Justice.

This case presents an issue of first impression in Alaska, the recognition of the

doctrine of equitable or virtual adoption. This issue will be addressed after a statement of the facts.

Appellant Calista Corporation is a Native Regional corporation established pursuant to the Alaska Native Claims Settlement Act[1] and organized under the laws of the State of Alaska.

Appellee Katie Mann is a Yup'ik Eskimo woman who resides in Hooper Bay, Alaska. Appellee Catherine Peters is an Athabascan woman who resides in Bethel, Alaska.

On April 15, 1975, appellee Katie Mann submitted to Calista Corporation an affidavit pursuant to AS 13.16.705(a),[2] stating that appellee Katie Mann was the culturally adopted daughter and heir of Jack Smart, a deceased shareholder of Calista Corporation and Sea Lion Corporation, and that under the Alaska laws of intestate succession, she was entitled to receive shares of Calista Corporation and Sea Lion Corporation stock.

On the same date appellee Catherine Peters also submitted an affidavit to Calista Corporation, stating that appellee Catherine Peters was the culturally adopted daughter and heir of Olivia Winniefred Johnson, a deceased shareholder of Calista Corporation, and that under the Alaska laws of intestate succession, she was entitled to receive shares of Calista Corporation and Bethel Native Corporation stock.

On April 21, 1975, Calista Corporation refused to transfer the stock to appellees. The corporation's refusal was based on its determination that appellees were not legally adopted persons and therefore were not entitled to inherit the stock through intestate succession as legally adopted persons would have been.

On June 2, 1975, the appellees filed a complaint in superior court against Calista Corporation, Bethel Native Corporation, and Sea Lion Corporation. This complaint sought declaratory judgment and injunctive relief to compel the corporations to approve appellees' affidavits and to further compel the corporations to transfer the stock to appellees. Sea Lion Corporation and Bethel Native Corporation stipulated that they had no objection to the court's granting the relief prayed for in appellees' complaint, and they were subsequently dismissed as defendants.

Calista Corporation moved for summary judgment, and appellees filed a cross-motion for summary judgment. A hearing on both motions was held before Superior Court Judge Eben H. Lewis on November 13, 1975. On November 18, 1975, Judge Lewis denied Calista's motion for summary judgment and granted appellees' cross-motion for summary judgment. Judge Lewis ordered Calista to approve appellees' affidavits for the transfer of their adoptive parents' stock and to transfer that stock pursuant to the affidavits.

Prior to entering his order, Judge Lewis entered his Conclusions of Law. As amended[3] these conclusions are as follows:

I. That the plaintiff, KATIE MANN, was adopted by Jack and Cecilia Smart in

1. Pub.L. 92–203; 85 Stat. 688; 43 U.S.C. 1601, *et seq.*

2. AS 13.16.705(a) provides in part:
 Until December 18, 1991, stock in a corporation organized under the laws of Alaska under the Alaska Native Claims Settlement Act (P.L. 92–203; 85 Stat. 688; 43 U.S.C. 1601 et seq.) which is inalienable under that Act is not subject to probate. Upon the death of the holder, if the stock does not pass by the testamentary disposition clause on the stock certificate, properly executed, it passes by will or intestate succession. In such a case,

the determination of the person entitled to the stock shall be made by the appropriate regional corporation on the basis of an affidavit, furnished to it and to the corporation which issued the stock, showing the right of the person entitled to the stock to receive it and to have a new certificate issued to him.

3. On December 1, 1975, counsel jointly submitted a Stipulation Amending the Conclusions of Law, and on the 18th of December, 1975, Judge Lewis entered an order adopting the stipulated amendments.

the traditional manner of the culture in which she lived, in that:

1. A promise or agreement by the adoptive parent to adopt the child, take him into the adoptive home, and raise him as a natural child.

2. The relinquishment by the natural parent of the care, custody, and control of the child to the adoptive parent.

3. A holding out by the adoptive parent to the child and to third persons that the child is the child of the adoptive parent.

4. The receipt by the adoptive parent of the child's affection, devotion, association, obedience and care during the former's lifetime.

5. At the adoptive parent's death the child has not been legally adopted.

II. That the plaintiff, CATHERINE PETERS, was adopted by Andrew and Olivia Winniefred Johnson in the traditional manner of the culture in which she lived, to wit:

1. A promise or agreement by the adoptive parent to adopt the child, take him into the adoptive home, and raise him as a natural child.

2. The relinquishment by the natural parent of the care, custody, and control of the child to the adoptive parent.

3. A holding out by the adoptive parent to the child and to third persons that the child is the child of the adoptive parent.

4. The receipt by the adoptive parent of the child's affection, devotion, association, obedience and care during the former's lifetime.

5. At the adoptive parent's death the child has not been legally adopted.

III. That equity regards as done that which ought to have been done.

IV. That the plaintiff KATIE MANN is the equitably and virtually adopted daughter of the decedent JACK SMART, and is entitled to share in the distribution of his CALISTA CORPORATION and SEA LION CORPORATION stock to the extent to which she would have been entitled to participate in the distribution had she been legally adopted.

V. That the plaintiff CATHERINE PETERS is the equitably and virtually adopted daughter of the decedent OLIVIA WINNIEFRED JOHNSON, and is entitled to share in the distribution of her CALISTA CORPORATION and BETHEL NATIVE CORPORATION stock to the extent she would have been entitled to participate in the distribution had she been legally adopted.

Appellant Calista Corporation has taken this appeal from the November 18, 1975, order.[4]

---

4. In addition to the conclusions of law, Judge Lewis also made 23 findings of fact which we find illuminating on the issue of the relationships between the appellees and their deceased, adoptive parents. As to Katie Mann, the findings were as follows:

I. That the plaintiff KATIE MANN is a Yup'ik Eskimo woman, and a resident of Hooper Bay, Alaska.
II. That the plaintiff KATIE MANN was born between 1920, and 1922, in Pymute, Alaska.
III. That NAPOLEON NAPOLEON and MARY NAPOLEON were the natural parents of the plaintiff KATIE MANN.
IV. That at the time of the birth of the plaintiff KATIE MANN, NAPOLEON NAPOLEON and MARY NAPOLEON entered into an agreement with JACK SMART and CECELIA SMART, both Yup'ik Eskimos, to adopt the plaintiff KATIE MANN, take her into their home and raise her as their natural child.
V. That pursuant to said agreement between NAPOLEON and MARY NAPOLEON and JACK and CECELIA SMART, NAPOLEON and MARY NAPOLEON relinquished the care, custody and control of the plaintiff KATIE MANN to JACK and CECELIA SMART.
VI. That pursuant to said agreement, from the date of her adoption until his death JACK SMART conducted and bore himself in private and public, by word and act, as the father of the plaintiff KATIE MANN, and held out to the plaintiff KATIE MANN and to all third persons that the plaintiff KATIE MANN was his daughter.
VII. That pursuant to said agreement, from the date of her adoption until his death, the plaintiff KATIE MANN conducted and bore herself in private and in public, by word and act, as the daughter of JACK SMART, and gave JACK SMART affection, devotion, asso-

As a preliminary matter we note that this is the first case in which this court has been called upon to adjudicate property rights under the Alaska Native Claims Settlement Act. Therefore, before turning to the merits of this appeal, we first must determine whether we have jurisdiction to adjudicate controversies which involve rights under the federal act.

 We first note that the federal government has the plenary and exclusive power to regulate Indian affairs.[5] As we noted in *Ollestead v. Native Village of Tyonek,* 560 P.2d 31 (Alaska, 1977), 28 U.S.C. § 1360[6] does not serve as a grant of juris-

ciation, obedience and care throughout his lifetime.

VIII. That Hooper Bay, Alaska, the place of residence of the plaintiff KATIE MANN, and JACK and CECELIA SMART, is an isolated Yup'ik Eskimo village located on the coast of the Bering Sea on the Yukon/Kuskokwim Delta.

IX. That because of the geographical and cultural isolation of Hooper Bay from white culture and the legal process, many Alaska Natives living in and around Hooper Bay did not and do not understand about, or enjoy access to the judicial systems of either the United States or the State of Alaska.

X. That because of NAPOLEON and MARY NAPOLEON's and JACK and CECELIA SMART's lack of understanding of and access to the judicial systems of a culture with which they were not familiar, the plaintiff KATIE MANN was never legally adopted, although she was adopted in the traditional manner of the culture in which she lives.

XI. That JACK SMART died intestate on or about June 21, 1972, at Hooper Bay, Alaska, leaving the plaintiff KATIE MANN, his culturally adopted daughter, as his only heir.

XII. That JACK SMART was a shareholder of defendant CALISTA CORPORATION and of the SEA LION CORPORATION, owning 100 shares of each.

As to Catherine Peters, the findings were as follows:

XIII. That the plaintiff CATHERINE PETERS is a 41 year old Athabascan Indian woman, who was born and raised in Holy Cross, Alaska.

XIV. That GEORGE PETERS and ANGELA JOHNSON PETERS were the natural parents of the plaintiff CATHERINE PETERS.

XV. That shortly after the birth of the plaintiff CATHERINE PETERS, GEORGE and ANGELA JOHNSON PETERS entered into an agreement with ANDREW JOHNSON and OLIVIA WINNIEFRED JOHNSON, both Athabascan Indians, to adopt the plaintiff CATHERINE PETERS, take her into their home and raise her as their natural child.

XVI. That pursuant to said agreement between the PETERS and the JOHNSONS, GEORGE and ANGELA JOHNSON PETERS relinquished the care, custody and control of the plaintiff CATHERINE PETERS to ANDREW and OLIVIA WINNIEFRED JOHNSON.

XVII. That pursuant to said agreement between the PETERS and the JOHNSONS, from the date of her adoption until the death of OLIVIA WINNIEFRED JOHNSON, the plaintiff CATHERINE PETERS conducted and bore herself in private and public, by word and act, as the daughter of OLIVIA WINNIEFRED JOHNSON, and gave OLIVIA WINNIEFRED JOHNSON affection, devotion, association, obedience and care throughout her lifetime.

XIX. That Holy Cross, Alaska, is an isolated Yup'ik Eskimo/Athabascan Indian village on the lower Yukon River.

XX. That because of the geographical and cultural isolation of Holy Cross from white culture and the legal process, many Alaska Natives living in and around Holy Cross did not and do not understand about, or enjoy access to the judicial systems of either the United States or the State of Alaska.

XXI. That because of GEORGE and ANGELA JOHNSON PETERS' and ANDREW and OLIVIA WINNIEFRED JOHNSON's lack of understanding of and access to the judicial systems of a culture with which they were not familiar, the plaintiff CATHERINE PETERS was never legally adopted, although she was adopted in the traditional manner of the culture in which she lives.

XXII. That OLIVIA WINNIEFRED JOHNSON died intestate on or about December 3, 1974, at Bethel, Alaska, leaving the heirs listed in the plaintiffs' Exhibit F, including her culturally adopted daughter, the plaintiff CATHERINE PETERS.

XXIII. That OLIVIA WINNIEFRED JOHNSON was a shareholder of defendant CALISTA CORPORATION and of the BETHEL NATIVE CORPORATION, owning 100 shares of each.

5. *See Bryan v. Itasca Cty, Minnesota,* 426 U.S. 373, 376–377 n.2, 96 S.Ct. 2102, 2105 n.2, 48 L.Ed.2d 710, 714 n.2 (1976).

6. 28 U.S.C. § 1360 reads as follows:

(a) Each of the State or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action,

diction to state courts to adjudicate property rights delineated in 28 U.S.C. § 1360(b). By operation of 43 U.S.C. § 1606(h)(1),[7] we find that the property involved in this litigation, the stock, falls within the scope of 28 U.S.C. § 1360(b). This is because the stock is held in trust by the United States and is subject to restrictions against alienation imposed by the United States. Thus, absent a conferral of jurisdiction by the United States, other than 28 U.S.C. § 1360, we find that we would be without authority to adjudicate this claim.

■ However, after an examination of the Alaska Native Claims Settlement Act, we find that insofar as the intestate disposition of stock in Native corporations is concerned, the Alaska Native Claims Settlement Act serves to confer jurisdiction on the State of Alaska.

■ Section 7(h)(2) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1606(h)(2), directs that upon the death of a stockholder, ownership in his stock shall be transferred in accordance with his last will and testament or "under the applicable

and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:

| State or Territory of | Indian country affected |
|---|---|
| Alaska | All Indian country within the Territory |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State |

(b) *Nothing in this section shall authorize the alienation,* encumbrance, or taxation *of any real or personal property,* including water rights, *belonging to any Indian* or any Indian tribe, band, or community *that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States;* or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; *or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.* (Emphasis added)

We interpret § 1360(a) to be a general grant of jurisdiction qualified by the limiting language of § 1360(b).

7. 43 U.S.C. § 1606(h) reads in its entirety as follows:

(1) Except as otherwise provided in paragraph (2) of this subsection, stock issued pursuant to subsection (g) of this section shall carry a right to vote in elections for the board of directors and on such other questions as properly may be presented to stockholders, shall permit the holder to receive dividends or other distributions from the Regional Corporation, and shall vest in the holder all rights of a stockholder in a business corporation organized under the laws of the State of Alaska, except that for a period of twenty years after December 18, 1971, the stock, inchoate rights thereto, and any dividends paid or distributions made with respect thereto may not be sold, pledged, subjected to a lien or judgment execution, assigned in present or future, or otherwise alienated: *Provided,* That such limitation shall not apply to transfers of stock pursuant to a court decree of separation, divorce or child support.

(2) *Upon the death of any stockholder, ownership of such stock shall be transferred in accordance with his last will and testament or under the applicable laws of intestacy,* except that (A) during the twenty-year period after December 18, 1971, such stock shall carry voting rights only if the holder thereof through inheritance also is a Native, and (B), in the event the deceased stockholder fails to dispose of his stock by will and has no heirs under the applicable laws of intestacy, such stock shall escheat to the Regional Corporation.

(3) On January 1 of the twenty-first year after the year in which this chapter is enacted, all stock previously issued shall be deemed to be canceled, and shares of stock of the appropriate class shall be issued without restrictions required by this chapter to each stockholder share for share. (Emphasis added)

laws of intestacy." We conclude that this language, which requires disposition of property in accord with state laws, also grants to the state courts the powers to interpret those laws. Further, we conclude that this interpretation is not violative of 28 U.S.C. § 1360(b)'s limitation on the power of state courts in probate proceedings to adjudicate rights in affected Indian properties.[8] Jurisdiction is therefore established.

Calista Corporation raises but one contention before this court: that appellees were not adopted by statutory methods and thus were not heirs of the decedents under Alaska law. We proceed to examine this contention.

The Alaska Native Claims Settlement Act specifically directs Native corporations on what basis stock of an intestate shareholder is to be transferred.[9] This federal statute directs that the applicable laws of intestacy are to control the distribution of stock on facts such as the ones before us. In order to qualify under the applicable Alaska laws of intestacy,[10] appellees contended that they were the "culturally" or "traditionally" adopted children of the deceased shareholders. Catherine Peters claimed to be an heir of Olivia Johnson within the meaning of AS 13.11.015,[11] and Katie Mann claimed to be an heir of Jack Smart within the meaning of AS 13.10.010(1).[12]

In attempting to define the terms found within these statutes, appellant Calista Corporation noted the following statutory definitions by which it felt bound: AS 13.06.050(21) defines "issue" as follows:

"[I]ssue" of a person means all his lineal descendants of all generations, with the relationship of *parent* and *child* at each

generation being determined by the definitions of child and parent contained in this code; . . . (Emphasis added)

AS 13.06.050(3) states that a "child":

[I]ncludes any individual entitled to take as a child under this code by intestate succession from the parent whose relationship is involved and excludes any person who is only a step-child, a foster child, a grandchild or any more remote descendant; . . .

AS 13.06.050(28) states that a "parent" includes:

[A]ny person entitled to take, or who would be entitled to take if the child died without a will, as a parent under this code by intestate succession from the child whose relationship is in question and excludes any person who is only a stepparent, foster parent, or grandparent; . . .

Section 13.11.045 of the Alaska Statutes states in part:

If, for the purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person, (1) an *adopted* person is the child of an adopting parent and not of the natural parents . . .. (Emphasis added)

Thus, appellant argues neither Catherine Peters nor Katie Mann is "issue" within the meaning of AS 13.06.050(21), a "child" as defined in AS 13.06.050(3) or entitled to claim through her alleged "adoptive parents" as an "adopted child" under AS 13.11.045. Appellant contends that for the purpose of property distribution on death intestate, the Alaska statutes provide the

---

**8.** See note 6, *supra.*

**9.** See note 7, *supra*, emphasized portion.

**10.** AS 13.11.005–13.11.060.

**11.** AS 13.11.015, the applicable statute at the time of Olivia Johnson's death, provides in part:
The part of the intestate's estate not passing to the surviving spouse under Section 10 of this chapter, or the entire intestate estate if there is no surviving spouse, passes as fol-

lows: (1) to the issue of the decedent. . .

**12.** AS 13.10.010(1) [1962], the applicable statute at the time of Jack Smart's death, provided in part:
. . . if the intestate leaves no widow or widower, all the . . . property left by the intestate is divided among his or her children and the issue of any deceased child by right of representation.

exclusive method for adoption, and distribution of the corporation's stock is limited by these statutory definitions.

In support of this position the appellant notes that adoption was unknown at common law [13] and exists only by statute.[14] In *In Re Bradley*, 6 Alaska 89, 91 (1918), the court stated:

> Adoption was unknown to the common law of England. It exists only by virtue of statute.

The court went on to quote from 1 Corpus Juris, Adoption § 115 (1914),

> The fact of adoption will never be presumed, but must be affirmatively proved by the person claiming its existence.

This notion is the basis of the law in eight states that no private agreement will suffice to bring a child within the statutes of descent and distribution.[15] These states refuse to recognize the doctrine of equitable adoption.

However, other jurisdictions have employed general equity jurisdiction to avoid hardship in determining if a valid adoption existed for purposes of allowing the child to participate in the proceeds of an intestate estate. Such a use of equity is effectuated under various names: specific performance of an agreement to adopt, virtual adoption, estoppel, or equitable adoption. Irrespective of the name given, these various theories all rest squarely upon the equitable maxim "that equity regards as done that which ought to have been done." We note that of the 34 states considering the question of equitable adoption, 26 have gone beyond the adoption statutes and allowed adoptions in equity under one theory or another.[16]

While in many of the cases there has been a failure to label the precise theory employed, or the elements of that theory, two basic approaches can be extracted from the case law. A case setting forth the criteria under the specific performance theory is *In Re Lamfrom's Estate*, 90 Ariz. 363, 368 P.2d 318, 320–321 (1962), wherein the court stated:

> This court has in two instances recognized the widely held doctrine of equitable adoption, and laid down the following principles: (1) the promisor must promise in writing or orally to adopt the child; (2) the consideration flowing to the promisor must be twofold: (a) the promisee parents must turn the child over to the promisor, and (b) the child must give filial affection, devotion, association and obedience to the promisor during the latter's lifetime; (3) when upon the death of the promisor the child has not been made the legally adopted child of the promisor, equity will decree that to be done which was intended to be done and specifically enforce the contract to adopt; (4) the child will be entitled to inherit that portion of the promisor's estate which he would have inherited had the adoption been formal. (Footnote omitted) [17]

The criteria under the estoppel theory were articulated in a recent Missouri case, *Mize v. Sims*, 516 S.W.2d 561, 564 (Mo.Ct.App. 1974), as follows:

> Equitable adoption in this state is founded upon well established equitable principles by which equity may grant specific enforcement of a contract to adopt, or declare, in a proper case, that a defendant is estopped to deny the adoption

**13.** But there is reason to think that fictions were used to reach the same result as adoption in extreme cases. Huard, *The Law of Adoption: Ancient and Modern*, 9 Vand.L.Rev. 743, 746 (1956).

**14.** Atwood, *Virtual Adoption and Rights of Inheritance*, 21 Wash. & Lee L.Rev. 312 (1964).

**15.** Note, *Equitable Adoption: They Took Him into Their Home and Called Him Fred*, 58 Va.L. Rev. 727, 727 n.7 (1972).

**16.** *Id.* at 728–729, n.10.

**17.** The elements categorized in *Lamfrom* generally have been present in instances in which the specific performance theory has been utilized, *e. g. Hickox v. Johnson*, 113 Kan. 99, 213 P. 1060 (1923); *In Re Rivolo's Estate*, 194 Cal. App.2d 773, 15 Cal.Rptr. 268 (1961); *Roberts v. Caughell*, 65 So.2d 547 (Fla.1953); *Wooley v. Shell Petroleum Corp.*, 39 N.M. 256, 45 P.2d 927 (1935).

agreed to be made. To warrant a decree of equitable adoption, it is not indispensable that a contract to adopt be shown by direct evidence, rather such an agreement may be inferred from the acts, conduct, and admissions of the adopting parent. "If, therefore, the statements, admissions, and conduct of the adopting parent 'are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence.' "

Furthermore, "Where one takes a child into his home as his own, thereby voluntarily assuming the status of parent, and by reason thereof obtains from the child the love, affection, companionship, and services which ordinarily accrue to a parent, he is thereafter estopped to assert that he did not adopt the child in the manner provided by law" provided that "justice, equity and good faith" compel a decree of equitable adoption. One who seeks a decree of equitable adoption has the onerous task of producing evidence so clear, cogent, and convincing as to leave no reasonable doubt in the chancellor's mind. (Emphasis and citations omitted)

■ After examining extensively the doctrine of equitable adoption, we conclude that it is a sound, equitable tool which, when utilized properly, allows courts to avoid unjust and often intolerable results. We further conclude that this court has the power to recognize such a doctrine [18] within the probate context.

In examining the facts of this case to determine if this appeal presents an appropriate situation in which to recognize equitable adoption, we begin by noting that uniquely divergent cultures are present in Alaska. Recently we had occasion to observe that:

The United States of America, and Alaska in particular, reflect a pluralistic society, grounded upon such basic values as the preservation of maximum individual choice, protection of minority sentiments, and appreciation for divergent lifestyles.[19]

One factor which makes Alaska particularly unique in this regard is the existence of various Native cultures which remain today much as they were prior to the infusion of Anglo-American culture.

While from a sociological standpoint this diversity of lifestyles has added strength to the cultural mosaic which comprises the Alaska community, it has created problems in administering a unified justice system sensitive to the needs of the various cultures. As we noted in *Gregory v. State*, 550 P.2d 374, 379 n.5 (Alaska 1976):

The Anglo-American system of justice differs substantially from the traditional Indian, Eskimo and Aleut systems, which predated Western cultures by hundreds of years. The cultural difficulties experienced by many of the Alaska Natives as the contemporary Anglo-American institutions reach out to the bush communities require that the State legal system use extreme care in cases of this nature.

In addition to the obvious cultural differences which are present in Alaska, we have observed that there is a "unique relation between bush and metropolitan areas in Alaska" and have stated that this factor is an appropriate one for consideration when examining the application of the laws to citizens of the bush areas.[20]

■ Accordingly, we conclude that the doctrine of equitable adoption is an appropriate vehicle which can be utilized in intestate succession cases [21] to avoid hardship

---

**18.** Section 13.06.015 of The Alaska Probate Code reads:

Unless displaced by the particular provisions of this code, the principles of law and equity supplement its provisions.

**19.** *Breese v. Smith*, 501 P.2d 159, 169 (Alaska 1972).

**20.** *Aguchak v. Montgomery Ward Co., Inc.*, 520 P.2d 1352, 1356 (Alaska 1974).

**21.** We do not mean to imply that the doctrine of equitable adoption has any application beyond direct, intestate succession nor that it could be employed in collateral inheritance situations.

created in part by the diversity of cultures found within this jurisdiction.

 After reviewing the cases of other jurisdictions, we have identified and now set forth the pertinent considerations which the trial court must examine in order to determine if equitable adoption can be established. The five elements that we find to be pertinent considerations are: (1) the foster parents must have died intestate; (2) there must have been a contract or agreement to adopt, either express or implied from the surrounding facts; (3) the foster parents must have represented to the child, either expressly or by their conduct, that he or she was adopted, thereby inducing the child, to the extent that his or her age permitted, to perform duties expected; (4) the child, to the extent that his or her age permitted, must have carried out his or her filial obligations in the belief that he or she was an adopted child;[22] and (5) any steps taken by the foster parents to legally adopt the child must not have been perfected.[23] We further hold that equitable adoption must be established by clear and convincing evidence.[24]

Here Judge Lewis' findings of fact[25] establish that the appellees have met this standard, and accordingly, we AFFIRM.

BOOCHEVER, Chief Justice, concurring.

The majority opinion asserts that Section 7(h)(2) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1606(h)(2), serves to confer jurisdiction on the courts of Alaska. While I also conclude that state courts have

jurisdiction to resolve these cases, I cannot agree with the rationale advanced by the majority.

Clearly, Congress may confer jurisdiction over Indian affairs on state courts. The Supreme Court has indicated, however, that such grants must be explicit.[1] I do not believe the Alaska Native Claims Settlement Act constitutes an explicit jurisdictional grant. Nothing in the Act specifically refers to the power of state courts. Although Section 7(h)(2) does suggest that Alaska intestacy law controls the present controversy, it does not directly confer jurisdiction on state courts to decide questions arisi[ng] under that law. That application of state law mandates a state forum is a non sequitur. In diversity cases arising in Alaska, for example, state law controls but, upon removal, the federal courts have exclusive jurisdiction.[2]

I would hold that jurisdiction is explicitly conferred by 28 U.S.C. § 1360(a), the general grant of jurisdiction over civil causes of action, and that the restrictions of § 1360(b) are inapplicable. Once jurisdiction has been conferred by Congressional act, I do not believe that exceptions to that jurisdictional grant should automatically be given the broadest possible coverage. Rather, such exceptions should be examined for the purpose of ascertaining Congressional intent.[3] In contrast to the situation presented in *Ollestead v. Native Village of Tyonek*, 560 P.2d 31 (Alaska 1977), where there was no language suggesting that the exceptions to state court jurisdiction were inapplicable, the provisions of the Alaska Native Claims

---

**22.** Because of the evidentiary problems of proof as to elements 3 and 4, we find that the establishment of these two elements is not mandatory.

**23.** Atwood, *Virtual Adoption and Rights of Inheritance*, 21 Wash. & Lee L.Rev. 312, 316 (1964).

**24.** *Lukas v. Hays*, 283 S.W.2d 561, 566 (Mo. 1955); *Hogane v. Ottersbach*, 269 S.W.2d 9, 11 (Mo.1954); *Capps v. Adamson*, 362 Mo. 539, 242 S.W.2d 556, 559 (1951); *Rich v. Baer*, 361 Mo. 1048, 238 S.W.2d 408, 411 (1951); *Benjamin v. Cronan*, 338 Mo. 1177, 93 S.W.2d 975, 979 (1936).

**25.** See note 4, *supra*.

**1.** *See e.g., Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), where the Supreme Court held that 28 U.S.C. § 1360(a) does not authorize state taxation of reservation Indians.

**2.** *See* 14 Wright and Miller, Federal Practice and Procedure § 3738 p. 746 (1976).

**3.** *See* 2 Horack, Sutherland Statutory Construction § 4936 p. 474 (3rd ed. 1943).

Settlement Act suggest that state court jurisdiction is not prohibited here.

43 U.S.C. § 1606(h)(1) does set forth restrictions on alienation of stock. Section 1606(h)(2), however, permits alienation at death by will or intestate succession. To this extent, at least, the stock is not subject to restraints on alienation. Section 1606(h)(2) additionally mandates the use of "applicable" intestacy law. Since both Jack Smart and Olivia Winniefred Johnson died intestate in the State of Alaska, I agree with the majority that Alaska law is to be applied in this case. Considered together, the provisions of § 1360(a) permitting application of Alaska law and § 1606(h)(2) providing for alienation at death seem to indicate that for intestacy proceedings, Congress did not intend that 28 U.S.C. § 1360(b) prohibit state court adjudication of rights in stock.

This conclusion is supported by a further statutory consideration. 43 U.S.C. § 1606(h)(1) provides that restrictions on alienation do not apply to transfer of the stock pursuant to court decree of separation, divorce or child support. The rationale behind this exception seems to be that in such situations, it is unlikely that state courts could apply their laws in a manner which would adversely affect Native rights in the corporations. An adjudication of property rights in restricted stock pursuant to state laws of intestacy involve identical considerations. In contrast to *Bryan v. Itasca County, supra* at Footnote 1, where the state, acting on its own initiative, attempted to tax the personal property of reservation Indians, both these situations involve decisions which usually pertain to necessary intra-familial transfers and do not intrude on Native rights. I conclude that Congress did not consider that the special protections of a federal forum were necessary.